COMMISSIONER OF INTERNAL REVENUE
v. MOORE, and three other cases.
Nos. 202, 203, 205, 206.

Circuit Court of Appeals, Tenth Circuit.
March 14, 1931.

Allin H. Pierce, Sp. Atty., Bureau of Internal Revenue, of Washington, D. C. (G. A. Youngquist, Asst. Atty. Gen., Sewall Key and Mr. John H. McEvers, Sp. Assts. to Atty. Gen., and C. M. Charest Gen. Counsel, Bureau of Internal Revenue, of Washington, D. C., on the brief), for petitioner.

Hubert L. Bolen and D. B. Welty, both of Oklahoma City, Okl., for respondents.

Before PHILLIPS and McDERMOTT, Circuit Judges, and KENNEDY, District Judge.

McDERMOTT, Circuit Judge.

The sole question involved on these appeals is whether the profit derived from the sale of certain oil stock should be charged into the income of the taxpayers for the year

1918, when the contract of sale was made, or whether it should be charged into the years in which the payments on the purchase price were actually received. The Board of Tax Appeals held that the entire profit was taxable in the year 1918, and, since the statute of limitations had run on the assessment of taxes for that year, that there was no taxable liability. The Commissioner appeals. The facts are not in dispute.

 In the year 1918 the taxpayers owned 200 shares of the capital stock of the Garfield Oil Company, that being one-half of its issued capital; the other half was owned by the Exchange Oil Company, a subsidiary of the Sinclair Oil & Gas Company. In 1918 the taxpayers undertook to negotiate a sale of their stock to the Exchange Oil Company. After some dickering, the parties agreed upon a sale price of $3,000,000, of which $500,000 was to be paid in cash, the balance to be paid by assigning 20 per cent. of the oil runs to the sellers until they had received $2,500,000, with the guaranty that such runs would equal at least $500,000 a year. Because of the greater financial responsibility of the parent Sinclair Company, it was agreed that that company should guarantee the deferred payments. The terms being agreed upon, it was left to the attorneys for the Sinclair Company to draw the papers. Such attorneys devised the plan of two contracts, one of them being an outright contract of purchase between the taxpayers and the Exchange Oil Company, by which the Exchange Company purchased the stock for $500,000 in cash and the delivery of oil and gas income certificates entitling the taxpayers or their assigns to 20 per cent. of the gross income of the Exchange Company, as and when received. The second contract was between the taxpayers and the Sinclair Company, by which the taxpayers purported to grant to the Sinclair Oil & Gas Company an option to purchase such certificates for the sum of $2,500,000. By that agreement the certificates, indorsed in blank, were delivered to a trustee named in the instrument. The taxpayers were to receive the income from the oil and gas certificates until such receipts equaled $2,500,000, when the Sinclair Company became the owner of such certificates. The Sinclair Company agreed that if in any one year the income from such certificates did not amount to the sum of $500,000, it would advance to the taxpayers the difference, without interest, and bound itself to purchase such certificates, five years from the date of the agreement, for a total consideration of $2,500,000. It is obvious that this is a firm contract of purchase, and not an option.

Reading these instruments together, as they must be, it is entirely clear that the taxpayers sold their stock for $3,000,000, $500,000 in cash and $2,500,000 in deferred payments, the Sinclair Company binding itself to the extent of $500,000 a year for five years. The taxpayers could receive no more than $3,000,000 for their property in any event, and the Sinclair Company was firmly bound to pay that amount in any event. This is not only the clear purport of the writings when read together, but is also the understanding of the taxpayers. One of them testified that $3,000,000 "was the fixed price. There was no question about that. * : * There was not any other view entertained by us but what we were receiving $3,000,000 as the purchase price for that property. * * * That was determined before we completed the sale." The understanding of the taxpayers is further evidenced by the fact that, notwithstanding that their income tax returns were on a cash basis, they did not account for the entire profit on the sale in their 1918 returns, but accounted only for the $500,000 received that year, and in each of the five succeeding years accounted for so much of the profit as was represented by the amounts received by them during the year in question.

Disagreement arose between the taxpayers and the Commissioner as to certain questions of depletion and other matters not here pertinent. During these negotiations with the Commissioner, the taxpayers maintained their original position that profits on the sale should be distributed over the five years. The negotiations with the Commissioner were so prolonged that the statute of limitations ran upon any additional assessment for the year 1918. The taxpayers then contended that the sale was complete in 1918; that, in fact, no part of the purchase price of the stock sold was received in the years 1919 to 1923, inclusive, despite their returns to the contrary: that the transaction with the Exchange Oil Company was separate and distinct from the transaction with the Sinclair Company; that what they had in fact done was to exchange their stock in the Garfield Oil Company for $500,000 in cash and oil and gas income certificates which had a ready market value; that, under section 202 (b) of the Revenue Act of 1918 (40 Stat. 1060), the sale should be treated as an exchange of property; the contemporaneous transaction with the Sinclair Company should be disregarded; and

no part of the sale price should be charged to them for the years 1919 to 1923, inclusive. The statute having run on the 1918 assessment, the result of their contention, if sound, is that four-fifths of the profit from this sale escapes any taxation.

▉▉ The Board of Tax Appeals sustained the contention of the taxpayers, and held that the transaction with the Exchange Oil Company was "complete in itself. * * * There were two transactions, each separate and distinct from the other and each giving rise to income." With this holding we cannot agree. The first contract, considered separately, does not express the agreement of the parties. If the Board of Tax Appeals is correct, the sale price of the stock was an unascertained and unascertainable amount, with $500,000 as a minimum, and that sum plus 20 per cent. of all the oil recovered under the leases as a maximum. But all the evidence is that the sale was bottomed on a fixed price of $3,000,000, of which $500,000 was to be paid in cash and the balance in deferred payments. This was the original agreement which the attorneys for the Sinclair Company were instructed to, and which they did, reduce to writing. That two contracts were drawn to effectuate that purpose cannot change the substance of the transaction. See O'Meara v. Commissioner, 34 F.(2d) 390, where this court construed two writings as reflecting but one transaction. Taxation is a practical matter, and the courts uniformly penetrate the form to get at the substance. Tyler v. United States, 281 U. S. 497, 50 S. Ct. 356, 74 L. Ed. 991, 69 A. L. R. 758; Chicago, M. & St. P. Ry. v. Mpls. Civic Ass'n, 247 U. S. 490, 38 S. Ct. 553, 62 L. Ed. 1229; Schoenheit v. Lucas (C. C. A. 4) 44 F.(2d) 476; Tsivoglou v. United States (C. C. A. 1) 31 F.(2d) 706; Phillips v. Gnichtel (C. C. A. 3) 27 F.(2d) 662.

▉ That leaves for determination the legal question of whether the entire profit on the sale should be charged to the year 1918, or whether it should be distributed through the years in which the purchase price was paid. The property involved is personal property; the sale was not one made by one regularly engaged in the sale of personal property on the installment basis, but was a casual sale; the buyer was responsible financially.

Section 213 (a) of the Revenue Act of 1918 (40 Stat. 1065), defines gross income as including profits arising from sales of personal property, and provides:

"The amount of all such items shall be in-cluded in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under subdivision (b) of section 212, any such amounts are to be properly accounted for as of a different period."

Article 42, Treasury Department Regulations 45, promulgated under this act, provides:

"The rule prescribed is that in the sale or contract for sale of personal property on the installment plan, whether or not title remains in the vendor until the property is fully paid for, the income to be returned by the vendor will be that proportion of each installment payment which the gross profit to be realized when the property is paid for bears to the gross contract price. * * * If the vendor chooses as a matter of consistent practice to treat the obligations of purchasers as the equivalent of cash, such a course is permissible."

The taxpayers were on a cash basis of accounting, and, in line with the statute above quoted, they did return the profits from this sale "in the gross income for the taxable year in which received by the taxpayer," proportioning the profit in accordance with the quoted regulation. Conceding, for the argument, that the statute and regulation afforded the taxpayers the election of treating the obligations of the purchaser as the equivalent of cash, the taxpayers otherwise elected; they may not now change that election, particularly since the result would be to throw all of the profit into a year where collection is barred by limitations. Lucas v. St. Louis National Baseball Club (C. C. A. 8) 42 F.(2d) 984; Rose v. Grant (C. C. A. 5) 39 F.(2d) 340; Alameda Investment Co. v. McLaughlin (C. C. A. 9) 33 F.(2d) 120; Holmes on Federal Income Tax (6th Ed.) 1278.

▉ Another point is worthy of notice. Section 212 (d) of the Revenue Act of 1926 (26 USCA § 953 (d), is made retroactive by section 1208 of the same act (26 USCA § 953a). That section, and the regulation promulgated thereunder (Reg. 69, art. 42), permits the distribution of profits on a sale on deferred payments in the case of "casual sale * * * for a price exceeding $1,000 * * * if the initial payments do not exce. 1 one-fourth of the purchase price." The section defines "initial payments" as cash or property other than evidences of indebtedness of the purchaser. The case at bar falls within the four corners of this retroactive statute.

The taxpayers argue that the transaction is governed by section 202 (a) of the Revenue Act of 1918, which provides that, where property is exchanged for other property, the property received in exchange shall "for the purpose of determining gain or loss be treated as the equivalent of cash to the amount of its fair market value, if any." It is argued that they received in exchange for their stock certain oil and gas income certificates, which, coupled with the agreement of the Sinclair Company to purchase, had a ready market value. But we do not regard the transaction as an exchange of their stock for the income certificates, but rather as a sale on deferred payments. The taxpayers never had any dominion over such certificates —they did not "receive them"—for by the very transaction of their issuance they passed to the Sinclair Company by a contract of sale. Reliance is had upon Fesler v. Commissioner (C. C. A. 7) 38 F.(2d) 155, and similar cases, which hold that, where property is exchanged for negotiable bonds or other property which may be readily liquidated, the profit is realized and taxable, under section 202 (a). The facts do not bring this case within the doctrines there announced, for this is not an exchange of property, but a sale on deferred payments. On the other hand, it was held by the Second Circuit in Bedell v. Commissioner, 30 F.(2d) 622, 624:

"But if land or a chattel is sold, and title passes merely upon a promise to pay money at some future date, to speak of the promise as property exchanged for the title appears to us a strained use of language, when calculating profits under the income tax. Section 202 (b) of the Act of 1918 provided for an exchange of property and made the profit depend upon 'the amount of its [the property received] fair market value, if any'—a phrase which was amended in the law of 1921 (42 Stat. 227) to 'readily realizable market value.' There is a difference between the two, but it is absurd to speak of a promise to pay a sum in the future as having a 'market value,' fair or unfair. Such rights are sold, if at all, only by seeking out a purchaser and higgling with him on the basis of the particular transaction. Even if we could treat the case as an exchange of property, the profit would be realized only when the promise was performed."

See, also, Foulke on Taxation, c. 18, "Installment Sales," and cases there cited; Davis v. United States (C. C.) 46 F.(2d) 377; O'Meara v. Commissioner (C. C. A. 10) 34 F.(2d) 390.

In Eisner v. Macomber, 252 U. S. 189, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570, the government urged that the recipient of a stock dividend had received taxable income, because the stockholder may sell the shares acquired by the stock dividend. The Supreme Court said that he might if he could find a buyer, but if and when he did sell, the profit realized was taxable income. The Supreme Court then said, at page 213 of 252 U. S., 40 S. Ct. 189, 195:

"Yet, without selling, the shareholder, unless possessed of other resources, has not the wherewithal to pay an income tax upon the dividend stock. Nothing could more clearly show that to tax a stock dividend is to tax a capital increase, and not income, than this demonstration that in the nature of things it requires conversion of capital in order to pay the tax."

It is so in this case. In 1918 the taxpayers had not realized all the profit from this sale. The profit was realized as they received the deferred payments. Aside from the $500,000, they received nothing in 1918 but a share in oil produced in later years and an agreement of the Sinclair Company. While the Sinclair Company was then, and now is, a solvent corporation, the fact still remains that the taxpayers did not realize the profit from the sale in 1918, but realized the profit during the ensuing years; and it is the general contemplation of the statutes that a tax shall be levied on profits which are realized and not deferred. If the contention of the taxpayers is sound, one who sells his farm to a responsible buyer on payments deferred over twenty years must account for the entire profit during the year of the sale. He has not actually received that profit; he has received no income out of which to pay the tax; the statute and the regulations give him the right to spread the tax; to deny him the right would, in our opinion, result in a hardship to taxpayers generally.

The causes are therefore reversed and remanded for further proceedings in accordance with this opinion.