## COMMISSIONER OF INTERNAL REVENUE
### v. GARBER.
### No. 6219.

Circuit Court of Appeals, Ninth Circuit.
June 8, 1931.

G. A. Youngquist, Asst. Atty. Gen., and Sewall Key, John H. McEvers, and Helen R. Carloss, Sp. Assts. to Atty. Gen. (C. M. Charest, General Counsel, and Allin H. Pierce, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for petitioner.

Hubert L. Bolen and D. B. Welty, both of Oklahoma City, Okl., for respondent.

Before RUDKIN, WILBUR, and SAWTELLE, Circuit Judges.

SAWTELLE, Circuit Judge.

The petitioner asks for a review of orders entered by the United States Board of Tax Appeals, reported in 11 B. T. A. 979.

In 1916, the respondent and his associates sold oil and gas leases in Oklahoma, aggregating approximately 11,000 acres, to the Garfield Oil Company. In consideration therefor, the vendors received 200 shares of the company's stock, such shares having a total par value of $20,000. Of the stock thus issued, the respondent acquired 75 shares. The 200 shares represented 50 per cent. of the Garfield Company's outstanding stock, the other half being owned by the Exchange Oil Company, of Tulsa, Oklahoma.

On December 14, 1918, the respondent and his associates entered into two agreements, the legal effect of which constitutes the determining issue of the present suit. One contract, between the respondent and his fellow stockholders, on the one hand, and the Exchange Oil Company, on the other, set forth that the "Stockholders," as the vendors designated themselves, sold their 200 shares to the Exchange Company for the following consideration:

1. A cash payment of $500,000.

2. Acquisition by the Exchange Company of all the property of the Garfield Company and assumption by the former of all the liabilities of the latter.

3. Delivery to the "Stockholders" by the Exchange Company of 200 gas and oil income certificates, entitling the "Stockholders" to 20 per cent. of the gross income of the Exchange Oil Company, derived from the sale of oil and gas from the Garfield Company's leases.

4. A stipulation that the Exchange Oil Company should not transfer any of the Garfield Oil Company's stock to any one save the Sinclair Oil & Gas Company, without the Sinclair Company's consent; and that in the event of such sale to any other interests, 25 per cent. of the sale price should be paid to the "Stockholders," but only up to such amount as would be sufficient, when added to the income theretofore paid on such certificates, to bring the total sum received for and from the certificates to $2,500,000.

In the foregoing contract, the Exchange Trust Company, of Tulsa, was designated as the trustee to receive payment of the sums accruing to the "Stockholders," under the oil and gas certificates. The Exchange Oil Company was to receive an assignment of all the assets of the Garfield Company, including the gas and oil mining leases and leasehold estates.

On the same day, December 14, 1918, the "Stockholders" entered into an agreement with the Sinclair Company whereby the former transferred their 200 oil and gas certificates to the Sinclair Company. Although the

agreement recites the sale to the Sinclair Company of "the sole and exclusive right and option to purchase," the contract was, as a matter of fact and of law, an outright agreement to purchase, on deferred payments.

This second contract set forth that the purchase price was to be $2,500,000; that, when the income from the 200 certificates reached that sum, the Sinclair Company would have the right to exercise its "option"; and that, if in any one year, the income from the certificates fell below $500,000, the Sinclair Company would "loan" the deficit to the "Owners," as Garber and his associates were designated in this agreement.

This agreement with the Sinclair Company also recited that the "Owners" should have the right to require the company to purchase the certificates upon the terms set forth, on December 14, 1923. Those terms were, in substance, that the Sinclair Company would pay to the "Owners" the difference between $2,500,000 and the amounts theretofore received from the oil certificates by Garber and his associates.

Taken together, and construed in the light of the negotiations that preceded their execution, the contracts clearly establish that the entire purchase price to be paid to Garber and his associates for their Garfield leases was to be $3,000,000. Of this amount, $500,000 was paid in cash by the Exchange Oil Company, a subsidiary of the Sinclair Company, and the balance was to be paid out of the income from the certificates, with the ultimate guaranty of outright purchase by the Sinclair Company, on December 14, 1923, of the 200 oil and gas certificates.

With the exception of the first payment of $500,000, on December 14, 1918, the entire purchase price of $3,000,000 was paid out of the receipts from the certificates, and no "loans" were made by the Sinclair Company to the vendors of the certificates, as provided for in the second contract.

While twelve assignments of error are set forth in the record, and seven specifications are urged in the brief for the petitioner, the controlling question of law presented in this case is whether or not the "income" derived from the sale of the Garfield oil stock, under the two foregoing agreements of December 14, 1918, was income taxable in its entirety in 1918, or was distributable according to the sums received from the certificates during the intervening years, up to and including 1923.

The petitioner contends that the tax became due as the various payments were received, from year to year. The respondent admits, in his brief, that he and his "associates computed their incomes and filed their returns for the years 1918 to 1923, inclusive, upon the cash receipts basis, and they claimed deductions for depletion." This basis of tax return the respondent now repudiates.

The Commissioner of Internal Revenue disallowed the depletion deductions, but he did allow the respondent to deduct in 1918 the entire cost of the Garfield Company stock, amounting to the respondent's share of the $20,000 total.

On August 27, 1925, the respondent herein filed an amended petition before the United States Board of Tax Appeals, claiming, among other things, that "(e) the profits from the sale of the taxpayer's interest in 75 shares of the capital stock of the Garfield Oil Company was income for the calendar year 1918, and not for 1919," adding that "the Commissioner erroneously included said income in the year 1919."

Curiously enough, the respondent "discovered his error" after the time within which the tax might have been assessed for 1918.

In the case of Alameda Investment Company et al. v. McLaughlin, 33 F.(2d) 120, decided by this court, the late Judge Rudkin, having before him the returns made by certain corporations, used the following language: "The separate and consolidated returns differ widely in form with different results to both the taxpayers and the government, and it would seem obvious that, when the taxpayers have once made their election, filed their returns, separate or consolidated, and paid their taxes, the election is binding on all parties concerned." See, also, Holmes, Federal Income Tax (6th Ed.) pp. 1278, 1279.

In addition, however, to the question of consistency or election, if any existed in this case, there are other considerations that impel us to the conclusion that the original method of making the present taxpayer's returns— i. e., on the theory of deferred payments— was the proper one to be followed in the instant case.

Section 213 of the Revenue Act of 1918, chap. 18, 40 Stats. 1057, 1065, provides:

"That for the purposes of this title (except as otherwise provided in section 233) the term 'gross income'—

"(a) Includes gains, profits, and income derived from   *   *   *   sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in

such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. The amount of all such items shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under subdivision (b) of section 212, any such amounts are to be properly accounted for as of a different period."

Article 42, Treasury Department Regulations 45, promulgated under that act, provides: "The rule prescribed is that in the sale or contract for sale of personal property on the installment plan, whether or not title remains in the vendor until the property is fully paid for, the income to be returned by the vendor will be that proportion of each installment payment which the gross profit to be realized when the property is paid for bears to the gross contract price. * * * If the vendor chooses as a matter of consistent practice to treat the obligations of purchasers as the equivalent of cash, such a course is permissible."

In the present instance, the taxpayer's "consistent practice" for six years had been to report his income as provided for in the foregoing statute and regulation thereunder —on a cash basis, from year to year.

Indeed, the taxpayer had urged the soundness of such a method in the original petition filed by him before the Board of Tax Appeals, on April 27, 1925—exactly four months before he discovered his "honest error." In that original petition, the present respondent set down as the proper principle of law applicable in this case the following: "(a) Gains, profits and income are to be included in the gross income for the taxable year in which they are received by the taxpayer, unless they are included when they accrue to him in accordance with the approved method of accounting followed by him."

The present taxpayer did not include in his return the gross income, whatever it might have been, from the trilateral transaction involving the Exchange Oil Company and the Sinclair Company, at the time such income accrued, as he now claims, namely, in 1918. Instead, he waited six years before asserting that it accrued and should have been reported in that year. His "approved method of accounting" during those six intervening years was on the cash basis, and rightly so.

Section 212 (d) of the Revenue Act of 1926, made retroactive by section 1208 of the same act (26 USCA §§ 953, 953a), provides:

"In the case (1) of a casual sale or other casual disposition of personal property for a price exceeding $1,000 * * * if * * * the initial payments do not exceed one-fourth of the purchase price, the income may, under regulations prescribed by the commissioner with the approval of the Secretary, be returned on the basis and in the manner prescribed in this subdivision." (See, also, article 42, Revenue Act of 1926, Reg. 69.)

The manner prescribed in the foregoing subdivision is the following: "A person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the total profit realized or to be realized when the payment is completed, bears to the total contract price."

The same subdivision defines "initial payments" as those "received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made."

In his brief, the respondent urges that the "guarantee and promise to pay by the Sinclair Oil & Gas Company clearly takes the transaction out of the rule above quoted and makes the cash and property received, all of the purchase price instead of less than one-fourth of the purchase price, for the reason that the property, 'other than evidences of the indebtedness of the purchaser,' was a pledge and promise of the Sinclair Oil and Gas Company."

If, as the respondent asserts, the "pledge and promise" of the Sinclair Company was "property," what was the value of that "property" in 1918? The Board of Tax Appeals, in its opinion, unequivocally acknowledged its inability to set a value on the Sinclair contract, in the following language: "The value of the right to receive the $2,500,000 in accordance with the terms of the contract can not be determined from the record and the respondent [Commissioner] has made no determination with reference thereto."

In view of this state of facts, we believe that the so-called "property value" of the Sinclair agreement was, in 1918, not of a nature to warrant our holding that such unascertained value, if any, could, together with the $500,000 cash payment, bring the transaction within the purview of the 25 per cent. clause of section 953.

We therefore turn to a consideration of the Sinclair agreement under general income-tax principles.

In Bedell v. Commissioner (C. C. A.) 30 F.(2d) 622, 624, Circuit Judge Learned Hand said: "If a company sells out its plant for a negotiable bond issue payable in the future, the profit may be determined by the present market value of the bonds. But if land or a chattel is sold, and title passes merely upon a promise to pay money at some future date, to speak of the promise as property exchanged for the title appears to us a strained use of language, when calculating profits under the income tax."

In considering the question of whether a stock dividend was income taxable by Congress, Mr. Justice Pitney, in the case of Eisner v. Macomber, 252 U. S. 189, 212, 213, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570, pointed out that, though a stockholder may sell the new shares acquired in the stock dividend, until he does so sell them, no income is acquired. See, also, Burnet v. Logan (Burnet v. Bruce) 51 S. Ct. 550, 75 L. Ed. ——, decided by the United States Supreme Court, May 18, 1931.

Counsel for the respondent cite a number of cases holding that where property is exchanged for negotiable paper or other property that can be readily liquidated, the profit is realized and taxable. No claim, however, is made that the Sinclair agreement was a negotiable instrument.

Indeed, the Sinclair transaction was hedged about with conditions, not only as to *time* of performance, but as to *certainty* of performance. The ultimate purchase of the oil certificates was not to be an automatic act; it required the "call" of the respondent and his associates: "In the event that the 'Sinclair Company' shall fail to consummate the purchase of the said oil certificates on or before the 14th day of December, 1923, and the 'Owners' shall not have exercised their right to call as hereinafter provided, the 'Trustee' shall return the said 'Oil Certificates' to the 'Owners' as their interests herein appear."

The facts and the law in the instant case are identical with those in Commissioner of Internal Revenue v. Moore and related cases, decided by the Tenth United States Circuit Court of Appeals on March 14, 1931, 48 F. (2d) 526, 529. The respondents in that case were the associates of the respondent in the present suit. In that case, the court, holding, as we do, that the trilateral transaction whereby the taxpayers sold their Garfield oil stock for $500,000 cash and $2,500,000 in deferred payments, gave rise to no income in 1918 save as to the cash payment, said:

"We do not regard the transaction as an exchange of their stock for the income certificates, but rather as a sale on deferred payments. The taxpayers never had any dominion over such certificates—they did not 'receive them'—for by the very transaction of their issuance they passed to the Sinclair Company by a contract of sale. Reliance is had upon Fesler v. Commissioner (C. C. A. 7) 38 F.(2d) 155, and similar cases, which hold that, where property is exchanged for negotiable bonds or other property which may be readily liquidated, the profit is realized and taxable, under section 202 (a). The facts do not bring this case within the doctrines there announced, for this is not an exchange of property, but a sale on deferred payments. * * *

"In 1918 the taxpayers had not realized all the profit from this sale. The profit was realized as they received the deferred payments. Aside from the $500,000, they received nothing in 1918 but a share in oil produced in later years and an agreement of the Sinclair Company. While the Sinclair Company was then, and now is, a solvent corporation, the fact still remains that the taxpayers did not realize the profit from the sale in 1918, but realized the profit during the ensuing years; and it is the general contemplation of the statutes that a tax shall be levied on profits which are realized and not deferred. If the contention of the taxpayers is sound, one who sells his farm to a responsible buyer on payments deferred over twenty years must account for the entire profit during the year of the sale. He has not actually received that profit; he has received no income out of which to pay the tax; the statute and the regulations give him the right to spread the tax; to deny him the right would, in our opinion, result in a hardship to taxpayers generally."

With this holding we are in entire accord. Such a view is based upon sound public policy as well as upon written law. It makes income taxable when it is received by the citizen. It precludes the possibility of a sudden change of theory after the statute of limitations has run. It does mathematical justice between government and taxpayer.

Judgment reversed.

WILBUR, Circuit Judge, concurs.