C. W. Titus, Incorporated, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 42268.    Promulgated January 17, 1936.

*W. Leo Austin, Esq.*, and *L. E. Cahill, Esq.*, for the petitioner.
*R. P. Hertzog, Esq.*, for the respondent.

SUPPLEMENTAL OPINION.

Trammell: This case has been reconsidered in so far as it relates to the taxable gain for 1926 derived from the sale of oil and gas leases in that year. After reconsideration we think that we were in error.

The petitioner entered into a contract in writing with the Tidal Oil Co. on February 27, 1926, the pertinent portions of which are as follows:

Therefore, for and in consideration of the sum of one dollar ($1.00) and other good and valuable considerations in hand paid by second party, (Tidal Oil Co.) the receipt whereof is hereby acknowledged by first party, and the mutual covenants and agreements hereinafter contained, It Is Understood. And Agreed by and between the parties hereto as follows:    *    *    *

Upon the approval of said titles and the execution and delivery to second party of the assignments, conveyance, orders and other papers referred to in the preceding paragraph, second party will pay to first party, as consideration for said properties, the sum of two million dollars ($2,000,000), payable as follows:

$500,000.00, in cash, upon the approval of titles and delivery of the papers above referred to;

$500,000.00 on or before September 1, 1926;

$500,000.00 on or before March 1, 1927; and

$500,000.00 on or before September 1, 1927.

Titus agreed to furnish abstracts to the property described in Exhibits A, B, C, and D, that is, the leases, within 10 days from the date of the contract. Upon approval of titles by the attorneys for the Tidal Oil Co., Titus was to immediately execute and deliver proper assignments, together with orders on the pipe line companies which might have been running the oil from said properties, and such orders and other papers as might be required or might be necessary in order to obtain the approval of the Secretary of the Interior of the assignments covering the oil leases from the Osage Indian Tribe, and when these things had been done the purchaser agreed to make the payments. The contract also provided that certain

real estate would be conveyed. It also contained the following paragraph:

IT IS UNDERSTOOD and agreed that the leases covering the lands described in Exhibits "A", "B" and "C" are being operated by the first party: (Titus) and that, upon the consummation of this transaction by the approval of titles and delivery of assignments and other papers as herein provided, possession of said leases is to be delivered to second party; (Tidal Oil Company) and that, pending the consummation of this transaction by the approval of titles and the delivery of possession, first party shall continue to operate said leases and will, upon delivery of possession thereof to second party, account to second party for all the oil and gas belonging to the interest in said oil and gas mining leases set forth in Exhibits "A", "B" and "C" run from said premises or sold from said premises on and after March 1, 1926, less operating expenses—it being understood that March 1, 1926, shall be construed to mean "midnight" on the date of February 28, 1926.

The agreement also provided that certain mining equipment on the property should be included in the sale. It also contained the following paragraphs:

IT IS UNDERSTOOD that five (5) wells are now drilling on said northwest quarter (NW¼) of section twenty-nine (29), township twenty-two (22) south, range ten (10) east, being at locations Nos. 7, 9, 12, 17 and 22 on said lease; and that the conveyances provided for herein shall include the interest of first party in all equipment on the premises on March 1, 1926, for use in the drilling and equipping of said wells; but it is agreed that second party shall assume the amount agreed to be paid by first party to the contractor for the drilling of said wells, it being understood that the same shall not be in excess of two dollars and twenty cents ($2.20) per foot.

IT IS UNDERSTOOD and agreed that the interest in said leases shall be conveyed free and clear of all and liens and encumbrances of whatsoever nature, including all taxes, general or special, for all years prior to 1926, and that any ad valorem taxes required to be paid for the year 1926, on account of said interest in said leases or any of them, shall be prorated by the parties hereto in proportion of one-sixth (1/6) by the first party and five-sixths (5/6) by second party. First party shall also pay all gross production taxes chargeable on its interest in all oil or gas produced from said properties during the months of January and February, 1926.

The contract had no fair market value.

In the previous opinion we held that a taxpayer keeping its books and records on the accrual basis is required to report the income represented by the deferred payments, regardless of the fair market value of the deferred payments. We also held that the petitioner had failed to show that the obligations in controversy had no fair market value or a fair market value less than the amount of the face thereof. We now think that we were in error in holding that the fact that the taxpayer kept its books on the accrual method of accounting was determinative of the issue, and also think we were in error in holding that there was no evidence that the deferred payments did not have a fair market value.

The regulations of the Commissioner, approved by the Secretary, under the Revenue Act of 1921 and all subsequent revenue acts have provided in the case of the sale of real estate on a deferred payment plan, not on the installment basis, where the obligations received by the vendor have no fair market value, that the payments in cash or other property having a fair market value shall be applied against and reduce the basis of the property sold and any excess of such basis shall be taxable to the extent of the excess, and that gain or loss is realized when the obligations are disposed of or satisfied, the amount being the difference between the reduced basis above mentioned and the amount realized therefor. These regulations have met the approval of the courts in the following cases: *Burnet* v. *S. & L. Building Corporation*, 288 U. S. 406; *Waukesha Malleable Iron Co.*, 67 Fed. (2d) 368; *Commissioner* v. *Moir*, 45 Fed. (2d) 356; and were followed by the Board in *Woodmar Realty Co.*, 17 B. T. A. 88. See *Davis* v. *United States* (Ct. Cls.), 46 Fed. (2d) 377; *Georgia-Florida Land Co.*, 16 B. T. A. 1253.

See also the reports of the Committee on Finance and the Ways and Means Committee in connection with the 1926 Revenue Act in the course of its passage through Congress. (69th Cong., 1st Sess., p. 19).

The Board has decided many cases of deferred payment sales of realty and casual sales of personal property without considering on what method the taxpayer kept its books. See *Morrow, Becker & Ewing Co.*, 21 B. T. A. 1013; *Charles C. Ruprecht*, 16 B. T. A. 919; *S. L. Meyer, Executor*, 23 B. T. A. 1201; *H. J. Kelly*, 3 B. T. A. 257; *Watson McMasters et al., Executors*, 18 B. T. A. 1119; affd., 62 Fed. (2d) 81, and other cases.

In view of the foregoing, it is our opinion that a taxpayer which keeps its books generally upon the accrual basis has the right to report and have its income computed upon the basis of the deferred payment plan not on the installment basis as provided in the regulations. In this case the respondent has raised no question as to this. The only real question is whether the deferred payments had a fair market value. The Commissioner contends that they did have. The question of the accrual basis was interjected by the Board and we now think that we were in error in doing so.

On the question of the fair market value of the deferred payments not represented by notes or other obligations of the purchaser, the Bureau ruled in G. C. M. 1387 (VI–1 C. B. 48) that in a case of a casual sale of personal property like a sale of real estate on the deferred payment plan, not on the installment basis, where the deferred payments are not represented by notes or other obligations of the purchaser, the cash received by the taxpayer should be applied against and reduce the basis of the property sold, and if it is in

excess of such basis, the excess should be reported as a profit. When the deferred payments are received they should be applied against the reduced basis if the initial payment was not in excess of the basis, and the excess over the reduced basis or the total amount received, as the case may be, should be included in income for the year received.

This ruling was modified in G. C. M. 3350 (VII-1 C. B. 62), wherein it was stated:

The conclusion reached in that memorandum (G. C. M. 1387) should be limited to cases in which the facts are similar to those therein considered where there is involved only a preliminary contract of sale such as is not ordinarily sold or dealt in and which can not be said to have any fair market value.

In the case at bar the only instrument in writing evidencing the fact that the future payments were to be made was the executory or preliminary contract, for the making of which the purchaser did not pay anything, and the obligation to make any payments did not arise until later during the taxable year when the petitioner had carried out the terms thereof.

In the case of *Charles C. Ruprecht*, 16 B. T. A. 919, we held as follows:

We do not consider, however, that the respondent's views with respect to the deferred payments are correct, for the reason that the obligation of the Standard Oil Co. to pay was not so evidenced that it could have been converted into cash, the only record thereof being in the deed of conveyance signed by the grantors. * * * In short, the obligation of the Standard Oil Co. amounted to nothing more than a mere noninterest-bearing account receivable.

We held in that case that the deferred payments to be made by the Standard Oil Co. did not have a fair market value and the Court of Appeals, in 49 Fed. (2d) 458, affirmed our decision.

In the case of *Commissioner v. Moore*, 48 Fed. (2d) 526, the taxpayer sold some stock for $500,000 in cash and the delivery of oil and gas income certificates entitling the taxpayer to 20 percent of the gross income in certain oil property, and it had another contract with the Sinclair Oil Co. by which the Sinclair Co. guaranteed that if the seller received less than $2,500,000 from the oil income it would make up the difference and bound itself to purchase the certificates for $2,500,000. The court read the two contracts together, holding that the taxpayer sold its stock for $3,000,000, $500,000 in cash and $2,500,000 in deferred payments which were guaranteed by the Sinclair Oil Co. The court held that, the sales on the deferred payment plan being casual sales, the taxpayer had the right to report it, as it did, as the income came in. The court said that the taxpayer returned the income from the sale in the gross income for the taxable year in which received by the taxpayer, *proportioning the income from the sale as the cash was received.*

The obligation of the Sinclair Co. to take the certificates at a fixed amount overcame any contingency which might have resulted from the agreement to take oil, so the decision was not based on the principle of the case of *Burnet* v. *Logan*, 283 U. S. 404.

The case of *Commissioner* v. *Garber*, 50 Fed. (2d) 588 (C. C. A., 9th Cir.), involved the same transaction as was involved in the *Moore* case, *supra*. The court, quoting from the *Moore* case, said:

In 1918 the taxpayer had not realized all the profit from this sale. The profit was realized as they received the deferred payments. Aside from the $500,000, they received nothing in 1918 but a share in oil produced in later years and an agreement of the Sinclair Company. While the Sinclair Company was then, and now is, a solvent corporation, the fact still remains that the taxpayers did not realize the profit from the sale in 1918, but realized the profit during the ensuing years; and it is the general contemplation of the statutes that a tax shall be levied on profits which are realized and not deferred. * * * he has not actually received that profit; he has received no income out of which to pay the tax; *the statute and the regulations give him the right to spread the tax; to deny him the right would, in our opinion, result in a hardship to taxpayers generally.* [Italics supplied.]

The court further stated:

With this holding we are entirely in accord. Such a view is based upon sound public policy as well as upon written law * * *. It precludes the possibility of a sudden change of theory after the statute of limitations has run. It does mathematical justice between the government and taxpayer.

In the case of *Bedell* v. *Commissioner*, 30 Fed. (2d) 622, the court said:

But if land or a chattel is sold, and title passes merely upon a promise to pay money at some future date, to speak of the promise as property exchanged for the title appears to us a strained use of language, when calculating profits under the income tax. Section 202 (b) of the Act of 1918 provided for an exchange of property and made the profit depend upon "the amount of its (the property received) fair market value, if any"—a phrase which was amended in the law of 1921 * * * to "readily realizable market value." There is a difference between the two, but it is absurd to speak of a promise to pay a sum in the future as having a "market value", fair or unfair. Such rights are sold, if at all, only by seeking out a purchaser and higgling with him on the basis of the particular transaction. Even if we could treat the case as an exchange of property, the profit would be realized only when the promise was performed.

In the case of *Calvin T. Graves*, 17 B. T. A. 1318, the petitioner sold certain lots to purchasers for a down payment, receipt of which was acknowledged in the written contract and the agreement to make certain payments in the future with interest at the rate of 6 percent per annum. The written instrument also contained the following:

It is further agreed that if the party of the second part defaults in the monthly payments herein provided, for a period of thirty days after any of said payments shall become due and payable, that then the balance remaining unpaid, together with the interest thereon as above provided, shall immediately

become due and payable, anything herein contained to the contrary notwithstanding, or the said parties of the first part may, at their option, declare this agreement at an end, and thereupon the said party of the second part agrees, upon receipt of written notice from the said parties of the first part of their election to declare this agreement at an end to surrender possession of said premises and to surrender the duplicate of this agreement properly cancelled without foreclosure proceedings or other process of law.

The agreement also provided for the payment of all taxes against the property which were due and payable at the date of the instrument. No note or any kind of security was received by the vendor for the unpaid part of the purchase price. We held that those sales in which the initial payment did not exceed 25 percent should be reported on the installment basis, and where the initial payment exceeded 25 percent, upon the deferred payment plan, not on the installment basis in which deferred payments had no readily realizable market value (this being under the 1921 Act), notwithstanding the fact that the deficiency was determined on the accrual basis. We did not inquire into the solvency of the purchaser. The obligation to pay on behalf of the purchaser was just as much a binding obligation in that case as in the case at bar, notwithstanding the fact that the seller had the option in case of default to declare all payments made in case of default as forfeited and to recover the property. This was not a right or option on the part of the purchaser and he would have been held to his legal liability on the written contract for the deferred payments.

In the case of *A. W. Henn*, 20 B. T. A. 1133, the petitioner sold certain leaseholds. He had an interest with another person. There was a contract in writing between the vendors which provided that the vendee should assume certain obligations of the third party to the vendors and should pay that obligation, $10,000 in cash, $10,000 in 60 days, $10,000 in 120 days, and $12,441.41 in 180 days, the deferred payments to draw interest at 6 percent. The vendor agreed that upon completion of the payments he would transfer and deliver the property to the purchaser. This contract was entered into in 1923. We held that only the cash received in 1923 was taxable in that year, and the cash received in 1924 was taxable in that year. We said:

The evidence is that no promissory notes or other evidences of indebtedness were received from the 1600 Prospect Co. in connection with the transaction under consideration. * * *

The assumption and payment by the George W. Stone Co. of the 1600 Prospect Co.'s indebtedness to the petitioner was the consideration for the assignment of that indebtedness and the transfer of 50 shares of common stock of the 1600 Prospect Co. by the petitioner to the George W. Stone Co. Thus it appears that as the indebtedness was paid by the George W. Stone Co., there was a realization upon (1) the indebtedness of the 1600 Prospect Co. amounting to

$42,441.41 ($41,487.29 assumed indebtedness of the Prospect Avenue Account and interest of $954.12), and (2) the selling price, if any, of the 50 shares of stock of the 1600 Prospect Co. * * *

Based upon the evidence and the admissions of counsel for the respondent at the hearing, there are findings of fact that the net incomes reported by the petitioner in his returns for 1923 and 1924 were computed upon the cash receipts and disbursements basis, and that the respondent's determination of deficiencies for those years is based upon net incomes computed upon the same basis. Under these findings, it is clear that the respondent erred in holding that the entire profit from the sale of the Hatch and Dagleisch leaseholds was realized in 1923, because a substantial part of the consideration involved in that transaction was not received until 1924.

In the case of *W. A. Hoult*, 23 B. T. A. 804, the petitioner exchanged his stock in one corporation for stock and securities in a new corporation and in a separate transaction sold part of the stock and securities of the new corporation. The contract of sale was in writing. A part of the consideration was in cash and the balance was to be paid in the year following the sale. The first payment was made on December 8, 1925, and the balance was paid in 1926 in accordance with the contract. Basing our decision upon the case of *Charles C. Ruprecht, supra*, and *A. W. Henn, supra*, we held that only the cash received in 1925 was subject to taxation in that year. We said:

Only the cash received in 1925 should be considered as "realized" in determining the gain taxable to petitioner for the year 1925.

In both of the above cited cases there were written contracts setting forth the payments to be made.

In the case of *Dudley T. Humphrey*, 32 B. T. A. 280, there was evidence that the nonnegotiable promissory notes did not have a fair market value. This evidence consisted of the testimony of the petitioner, himself, to the effect that the notes received were nonnegotiable and, being nonnegotiable, did not have any fair market value. On the other hand, financial statements were introduced showing that the purchaser, that is, the maker of the notes, had net assets in excess of the amount of the notes even by using the book values of the securities owned by the purchaser, which had greatly increased in value. The basic evidence in the case as to the fair market value of the notes consisted of the fact that the notes were nonnegotiable, and, being so, had no fair market value. We said "A mere promise to pay in the future which is not accepted in payment, but only as an evidence of indebtedness, is not ordinarily the equivalent of cash", and the *Bedell* case, *supra*, was cited and relied on. Here the contract itself obviously only represented the evidence of the indebtedness and was not, itself, accepted in payment for the property.

In none of the foregoing cases was there any evidence introduced directed to the question of the fair market value of the promise to

pay, except in the case of *Dudley T. Humphrey, supra,* discussed above.

In all of the court decisions above discussed the courts took the position that, when evidence was introduced showing that the deferred payments were evidenced only by contract, where no notes, bonds, or other evidences of indebtedness other than the contract were given, such contract had no fair market value, and that the amounts of the deferred payments should be included in income when received. In the *Ruprecht* case, *supra,* the only evidence of the deferred payments was contained in the deed of conveyance. Based on this finding we held that the deferred payments did not have a fair market value. Our conclusion was based on the fact that the vendor had nothing that he could take to anyone to sell; he had nothing except an account receivable. In this case, while the petitioner had a written contract, there was nothing in the contract itself to indicate when, if ever, the purchaser would become bound to make the payments. To show that the purchaser had become bound to make the payments would have required extrinsic evidence. There were certain things required to be done by the vendor under the terms of the contract before the delivery of the deed or before the vendor was obligated to accept it. Evidence of delivery and acceptance of the deed was a *sine qua non* to any liability. When this was established there would have been a prima facie obligation to make the full payments as provided in the contract, yet an assignee would have been entitled to know beyond a prima facie case that all the obligations of the purchaser had definitely arisen, that is, that all titles were good, all transfer orders were made, approval of the Secretary of the Interior secured as to the leases from Indian tribes, and other things required had been done. After the delivery of the deed there was still an accounting to be had between the vendor and vendee for all the oil produced since the execution of the contract, and other adjustments were required. In any event, the petitioner, itself, after the delivery of the deed, was possessed of nothing in writing to show that it had fully complied with the executory or preliminary contract to make it obligatory on the purchaser's part to make the payments, except possibly its books and records, which would show the account receivable, but the record is silent as to whether any liability was ever shown on the books. We think, therefore, that the principle of the *Ruprecht* case, *supra,* as well as the court decisions and other Board cases herein referred to, are applicable in this case. In the cases of *Henn, supra,* and *Hoult, supra,* where the deferred payments were evidenced by contracts in writing, we followed the *Ruprecht* case.

In order for the petitioner to be able to convert the promise to pay into cash it would have had to produce and deliver to a purchaser

936

the evidence of liability to pay. Only a conditional or contingent liability is shown by the instrument itself. The real liability in this case could be shown only by oral testimony, and, while we have assumed from the record that the sale was consummated in 1926, there is no direct and conclusive evidence to that effect. An obligation to pay in the future which depends so largely on oral evidence to support it, in our opinion, can not be said to have a fair market value, aside from the reasoning of the courts and the Board as to written contracts, and in this case, even after the sale had been consummated, there was still an accounting to be had for oil produced since the making of the executory or preliminary contract. The purchaser would have had an offset for an undetermined amount after the delivery by petitioner of all papers required to be delivered until such time as petitioner fully settled on the basis of such accounting. This fact, in connection with all the facts and circumstances, convinces us of the lack of any fair market value of the deferred payments.

Upon reconsideration, therefore, it is our opinion that the petitioner had the right to include in its taxable income for 1926 only the cash received. Petitioner had the right to have his tax computed upon the basis of the deferred payment plan, not on the installment basis. We think we were in error in our previous decision and it is, therefore, modified in accordance with the opinion herein.

*Judgment will be entered under Rule 50.*