Frank Cowden, Sr., and Gladys Cowden, et al.,[1] Petitioners, *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 59237–59239, 59326, 60001. Filed June 30, 1959.

*Richard S. Brooks, Esq.*, for the petitioners.
*Roy E. Graham, Esq.*, for the respondent.

Withey, *Judge:* The respondent has determined deficiencies in the income tax of petitioners as follows:

[1] The following proceedings are consolidated herewith: Frank Cowden, Jr., and June Cowden, Docket No. 59238; Courtney Cowden, Docket No. 59239; Elizabeth Ann Cowden Walter, Docket No. 59326; and Courtney Cowden and Margaret P. Cowden, Docket No. 60001.

| Taxpayer | Amount | |
|---|---|---|
| | 1951 | 1952 |
| Frank, Sr., and Gladys Cowden | $126,624.97 | $52,307.20 |
| Frank, Jr., and June Cowden | 24,060.05 | 5,907.12 |
| Courtney Cowden | 32,971.07 | ---------- |
| Courtney and Margaret Cowden | ---------- | 5,949.56 |
| Elizabeth Ann Cowden Walter | 27,279.82 | 8,296.66 |

The issues to be determined are as follows:

1. Where, under a mineral lease and accompanying written agreements executed in 1951, the major portion of an oil bonus or advance royalty was payable in 1952 and 1953, did respondent err in determining that petitioner-lessors realized taxable income in 1951 to the extent of the discounted value of the portion of the bonus or advance royalty payable in 1952 and 1953?

2. Did respondent err in disallowing a deduction for the cost of internal revenue documentary tax stamps affixed to the mineral lease?

FINDINGS OF FACT.

The stipulated facts are so found.

Frank Cowden, Sr., and Gladys Cowden (hereinafter called, respectively, Frank, Sr., and Gladys) are husband and wife residing in Midland, Texas. They filed joint income tax returns on the cash basis for the calendar years 1951 and 1952 with the then collector of internal revenue at Dallas.

Frank Cowden, Jr., and June Cowden (hereinafter called, respectively, Frank, Jr., and June) are husband and wife residing in Midland, Texas. They filed joint income tax returns on the cash basis for the calendar years 1951 and 1952 with the then collector at Dallas.

Elizabeth Ann Cowden Walter (hereinafter called Elizabeth) resides at Houston, Texas. She filed her individual income tax returns on the cash basis for the calendar years 1951 and 1952 with the then collector at Dallas, at which time she resided in Midland, and filed her returns under the name of Elizabeth Ann Cowden.

Courtney Cowden and Margaret P. Cowden (hereinafter called, respectively, Courtney and Margaret) are husband and wife residing in Midland, Texas. They were married in 1952, prior to which time Courtney resided in Midland. He filed his individual income tax return on the cash basis for the calendar year 1951, and he and Margaret filed their joint income tax return on the cash basis for the calendar year 1952, all with the then collector of internal revenue at Dallas.

Frank, Sr., and Gladys are the parents of Frank, Jr., Courtney, and Elizabeth. On December 30, 1948, they conveyed to their children equal shares in an undivided one-half interest in and to the oil, gas, and minerals in and under certain lands in Texas, reserving to Gladys, her heirs, and assigns the right of "selling and granting oil,

gas and other mineral leases * * * [but] the grantees herein * * * shall be entitled to receive the bonus * * * the delay rentals * * * and all royalties."

In April 1951, petitioners entered into an oil, gas, and mineral lease covering portions of the foregoing premises in favor of Stanolind Oil and Gas Company (hereinafter called Stanolind), under which lease and accompanying written agreements, signed by all parties having mineral interests in the property, fixed amounts of "bonus" or "advance royalty" were payable as follows:

| Payee | Payments due— | | | |
|-------|---------------|---|---|---|
|       | On execution | Jan. 5, 1952 | Jan. 5, 1953 | Total |
| Frank, Sr., and Gladys | $5,111.92 | $125,242.16 | $125,242.17 | $255,596.25 |
| Frank, Jr. | 1,703.97 | 41,747.39 | 41,747.39 | 85,198.75 |
| Courtney | 1,703.98 | 41,747.38 | 41,747.39 | 85,198.75 |
| Elizabeth | 1,703.98 | 41,747.38 | 41,747.39 | 85,198.75 |
| Total |  |  |  | 511,192.50 |

The due dates of the deferred payments were subsequently modified to "no earlier than" January 5 "nor later than" January 10 of each respective year.

The last paragraph of the deferred payment agreements was as follows:

This contract evidences the obligation of Stanolind Oil and Gas Company to make the deferred payments referred to in subparagraphs (b) and (c) of the preceding paragraph hereof, and it is understood and agreed that the obligation of Stanolind Oil and Gas Company to make such payments is a firm and absolute personal obligation of said Company, which is not in any manner conditioned upon development or production from the demised premises, nor upon the continued ownership of the leasehold interest in such premises by Stanolind Oil and Gas Company, but that such payments shall be made at all events.

On November 30, 1951, Frank, Sr., and Gladys assigned the bonus payment due them in 1952 to the First National Bank of Midland (hereinafter called the bank). The bank credited to the account of Frank, Sr., the amount of the installment so due, and issued a deposit slip therefor. Frank, Sr., gave the bank his check in the amount of $257.43, as a discount on the transaction.

On the same day, Frank, Jr., Courtney, and Elizabeth executed assignments to the bank of the respective bonus payments due them from Stanolind in 1952. The bank issued to each a deposit slip in the amount of such payment, but deducted in each case a discount in the amount of $85.81.

On November 20, 1952, Frank, Sr., and Gladys assigned to the bank the Stanolind bonus payment due them in 1953. The bank made the appropriate credit to the account of Frank, Sr., and issued a deposit

slip in the amount of the payment due less discount of $313.14, which it treated as interest received.

On the same day, Frank, Jr., Courtney, and Elizabeth similarly assigned to the bank their respective 1953 bonus payments. The bank issued each a deposit slip showing the face amount of the installment due and deducting a discount in the amount of $104.38.

The bank did not acquire for its own benefit the Stanolind obligations running to Frank, Jr., Courtney, and Elizabeth. The funds placed to their credit were obtained through First Mortgage Company, Midland (hereinafter called the company), from Frank, Sr. The discount deducted on each deposit slip in the names of Frank, Jr., Courtney, and Elizabeth inured to the benefit of Frank, Sr., and was reported by him on his income tax returns as interest received. Both the bank and the company acted only for the accommodation of Frank, Sr., neither receiving any benefit therefrom.

Frank, Sr., has lived in Midland all of his life. He has been in the ranching and banking business, and has made a number of oil and gas leases. Throughout 1951 and 1952, he was a director of the bank and of the company. None of the other petitioners owned any stock or had any position in or relationship to either organization during those years.

Frank, Sr., and Gladys purchased and affixed to the foregoing Stanolind lease United States internal revenue documentary tax stamps in face amount and at a cost to them of $562.50. They deducted this amount in their income tax return for 1951, but respondent has disallowed the deduction so claimed.

In negotiations leading to the lease and agreements, no terms were discussed which varied substantially from those actually reached, and no other or further agreements were made. However, Stanolind's budget system, within which the transaction in question was authorized, was prepared on the premise of immediate cash payments, and petitioners could have received the full amount of the oil bonus or advance royalty at once. The payments were deferred solely because of the wishes of Frank, Sr. He also then intended to sell or assign the bonus agreements prior to their maturity. He believed the bonus agreements had a fair market value at the time of their execution.

Prior to the assignments of the deferred payments, at the time it first began to deal in them in 1950 or 1951, the bank obtained an opinion from its counsel that the obligations represented thereby were "direct and bankable." The bank had, over several years, acquired a number of other such obligations in like manner. Such transactions, however, were not considered commonplace. After such assignments, generally the bank looked solely to the credit of the oil company, and did not consider the credit or recourse of the assignor.

In 1951, but after the first series of assignments, Stanolind attempted to prepay to the bank the amounts due in 1952. It did not do so because petitioners refused to sign an agreement specifying that such payment should be in satisfaction of Stanolind's obligation in respect of the 1952 payments. In 1952, Stanolind was willing to prepay the 1953 payments, but did not seek to do so because of the previous attitude of petitioners and the probability that they would prove no more cooperative than before. The bank was willing to accept prepayments, but could not do so because Stanolind required petitioners' signatures.

In determining the deficiencies involved herein the respondent determined that the agreements in which Stanolind agreed to pay the petitioners the following indicated amounts payable in installments, namely, on execution of the lease, and in 1952 and 1953, represented ordinary income to the petitioners in 1951 to the extent of the fair market value of the agreements at the time of their execution and that such values were at least as follows:

| Payee | Total of payments Stanolind agreed to make | Fair market value determined by respondent |
|---|---|---|
| Frank, Sr., and Gladys | $255,596.25 | $243,823.72 |
| Frank, Jr | 85,198.75 | 81,274.58 |
| Courtney | 85,198.73 | 81,274.58 |
| Elizabeth | 85,198.73 | 81,274.58 |
| Total | 511,192.50 | 487,647.46 |

The obligations of Stanolind for the payment of the portions of the bonus payable in 1952 and 1953 were readily and immediately convertible to cash at their full face value upon execution and delivery of the lease and accompanying written agreements in April 1951 and remained so to and through their maturity date. Such obligations of Stanolind, at the time of their creation in April 1951, had a fair market value equal to their face value.

OPINION.

*Issue 1.*

Respondent contends that the obligations of Stanolind to make the required deferred payments had a fair market value equal to the discounted value of the payments required, and that such amount is taxable in full to petitioners in 1951 under section 111(b), I.R.C. 1939.[2]

---

[2] SEC. 111. DETERMINATION OF AMOUNT OF, AND RECOGNITION OF, GAIN OR LOSS.

(b) AMOUNT REALIZED.—The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received.

Petitioners contend, on the other hand, that the oil leases involved provide for the payment to petitioners of rentals both in the form of oil payments for the use of the land in its exploitation for oil and in the form of future bonus payments; that the rights of petitioners to receive future bonus payments have no fair market value and cannot therefore result in income to them upon their execution; that petitioners, being cash basis taxpayers, are chargeable with taxable ordinary income only upon the making of such bonus payments to them; and lastly, that the anticipatory sale of such rights to future bonus payments constitutes a sale of capital assets resulting only in capital gain or loss.

Petitioners cite *C. W. Titus, Inc.*, 33 B.T.A. 928; *Charles C. Ruprecht*, 16 B.T.A. 919, affd. (C.A. 5) 39 F. 2d 458; *Dudley T. Humphrey*, 32 B.T.A. 280; *Alice G. K. Kleberg*, 43 B.T.A. 277; and *Bedell* v. *Commissioner*, 30 F. 2d 622, as authority for the general proposition that executory contracts to make future payments in money do not have a fair market value. Although respondent has taxed the instant rights to future payments on a discounted value equal to the face amounts less 4 per cent discount, petitioners have offered no proof to show that they had no value. They rely completely in this respect on the cited authorities. We think they are readily distinguishable from this case upon the facts. In none of those cases were there findings of fact, as there are here, that the bonus payors were perfectly willing and able at the time of execution of the leases and the bonus agreements to pay such bonus in an immediate lump-sum payment; to pay the bonus immediately in a lump sum at all times thereafter until the due dates under the agreements; that Cowden, Sr., believed the bonus agreements had a market value at the time of their execution; that a bank in which he was an officer and depositor was willing to and in fact did purchase such rights at a nominal discount; that the bank considered such rights to be bankable and to represent direct obligations of the payor; that the bank generally dealt in such contracts where it was satisfied with the financial responsibility of the payor and looked solely to it for payment without recourse to the lessor and, in short, that the sole reason why bonuses were not immediately paid in cash upon execution of the leases involved was the refusal of the lessor to receive such payments. We are convinced from the particular facts of this case that, contrary to the facts in the cited cases, here the bonus payments were not only readily but immediately convertible to and were the equivalent of cash and for that reason had a fair market value in their face amounts. This value, less depletion allowances, represents

ordinary income to petitioners upon the date of execution and delivery of the leases and the agreements to pay bonuses in the future taxable under section 22(a) of the 1939 Code. *Harry Leland Barnsley*, 31 T.C. 1260. The petitioners are not taxable upon the fair market value of the bonus agreements under section 111(b) as contended by the respondent for that section deals with sales or other dispositions of property which, under the principles laid down by the Supreme Court in *Burnet* v. *Harmel*, 287 U.S. 103, do not occur upon the execution of leases involving the extraction of oil from demised lands.

The fact that petitioners reported their taxable income on the cash basis of accounting is of no consequence here for no matter on what basis income is reported where, as here, an immediate payment in money or its equivalent is made as consideration for the execution of a lease, that payment constitutes taxable income under any accounting and reporting method. Decision on this issue is for respondent.

Having so decided the first issue, it becomes unnecessary to consider an alternative issue as to whether, on the anticipatory sales of their bonus agreements, petitioners realized taxable gains under section 117(j) of the 1939 Code.

### *Issue 2.*

Petitioners contend that the cost of internal revenue documentary tax stamps affixed as required by law to the leases is deductible as a business expense, while it is respondent's position that such cost is a capital expenditure.

In *Dorothy Cockburn*, 16 T.C. 775, the identical issue was presented, and it was there held that such expenses are capital in nature. See also *L. S. Munger*, 14 T.C. 1236.

The only authority to the contrary to which our attention has been directed is an opinion, not officially reported, of the District Court for the Northern District of Texas. *Naylor* v. *Dunlap* (40 A.F.T.R. 1387, 49–2 U.S.T.C. par. 9446). No authorities are cited in that opinion and the summary discussion of this issue does not convince us that we erred in the *Cockburn* case. We therefore hold that respondent did not err in disallowing this deduction.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

---

FORRESTER, *J.*, dissenting: I respectfully dissent from the holding of the majority on the first issue.

The conclusion there reached is in effect that taxpayers are not free to make the bargain of their choice, even though that bargain be made at arm's length with a third party.

Said conclusion seems to be based on the narrow premise that section 111(b) cannot apply because of the character of the thing bargained away and upon the broad premise that this particular contract with Stanolind was the equivalent of cash in petitioners' hands and therefore taxable under section 22(a).

As to the narrow premise it seems clear to me that the word "property" in section 111(b) was intended to mean "something of value" whether real, personal, tangible, intangible, or as here, the right and power to demise, and *Burnet* v. *Harmel*, 287 U.S. 103, cited by the majority, does not hold otherwise.

That section 111(b) is broad enough to cover intangibles has never been questioned. See *Perry* v. *Commissioner*, 152 F. 2d 183, involving, *inter alia*, contractual rights and unliquidated claims; *A. W. Henn*, 20 B.T.A. 1133, involving, *inter alia*, interests in leaseholds; *Alice G. K. Kleberg*, 43 B.T.A. 277, involving the right to receive annual payments of cash; and *Curtis R. Andrews*, 23 T.C. 1026, involving a partnership interest.

As to the broad premise of the equivalent of cash, the majority cites no case which has gone so far down the road of constructive receipt. *Harry Leland Barnsley*, 31 T.C. 1260, dealt with negotiable notes having a stipulated fair market value. Indeed, *Barnsley*, by way of dictum, indicates a contrary result in the instant case and approves *Alice G. K. Kleberg, supra*, which is factually similar.

The basic questions for resolution in constructive receipt cases are whether the thing received was received in satisfaction of the obligation, or merely as evidence thereof, *Dudley T. Humphrey*, 32 B.T.A. 280, *C. W. Titus, Inc.*, 33 B.T.A. 928, and if the former, its fair market value. In resolving these questions courts have usually drawn the line at negotiable instruments, known to the law merchant, and such instruments have acquired the status of property, separate and apart from the obligations they represent. *Commissioner* v. *Moore*, 48 F. 2d 526; *Bedell* v. *Commissioner*, 30 F. 2d 622; *Commissioner* v. *Garber*, 50 F. 2d 588; *Charles C. Ruprecht*, 16 B.T.A. 919, affd. 39 F. 2d 458 (C.A. 5); *Dudley T. Humphrey, supra; Perry* v. *Commissioner, supra; A. W. Henn, supra; Alice G. K. Kleberg, supra; Nina J. Ennis*, 17 T.C. 465; *Curtis R. Andrews, supra. Perry* v. *Commissioner, supra*, made the distinction by stating that a simple contractual promise to pay had *intrinsic* value, but not the *fair market* value required by the statute. In *Bedell* v. *Commissioner, supra*, Judge Learned Hand stated:

But if land or a chattel is sold, and title passes merely upon a promise to pay money at some future date, to speak of the promise as property exchanged for the title appears to us a strained use of language, when calculating profits

under the income tax. * * * it is absurd to speak of a promise to pay a sum in the future as having a "market value," fair or unfair. *Such rights are sold, if at all, only by seeking out a purchaser and higgling with him on the basis of the particular transaction.* Even if we could treat the case as an exchange of property, the profit would be realized only when the promise was performed. [Emphasis supplied.]

The reason for thus drawing the line is clear. A negotiable promissory note is freely and easily negotiable chiefly because equities and defenses available between the original parties thereto are not available as against a third-party purchaser for value, before maturity and without notice. This rule does not extend to such unique rights as the simple, executory promise to pay in the future involved in the instant case.

True, the facts indicative of intrinsic value of the Stanolind contracts are strong, but other cases have involved solvent obligors. Sinclair Oil & Gas Company in *Commissioner* v. *Moore, supra;* Standard Oil Co. in *Charles C. Ruprecht, supra;* Tidal Oil Co. in *C. W. Titus, Inc., supra;* and the King estate in *Alice G. K. Kleberg, supra.*

True, the Stanolind contracts were discounted at almost face value, but not to a stranger, for Frank Cowden, Sr., was a director of both First National Bank of Midland and of First Mortgage Company, Midland, and it is found as a fact that the bank did not consider such transactions commonplace.

Thus the result reached by the majority can only be based upon the proposition that Stanolind would have as willingly paid the bonuses in cash on execution of the lease and therefore these cash basis taxpayers were in constructive receipt of the cash.

In my view this is a far-reaching and dangerous extension of the doctrine of constructive receipt. Petitioners should be taxed on the basis of the transaction into which they actually entered, not one into which they might have or could have entered.

It has been axiomatic that a taxpayer is free to cast his transactions in any manner he may choose, and the tax consequences of such transactions are to be based on what he did, not what he could have or might have done, the only qualification being that he must in fact have done what he claims, not merely appear to have done so. As expressed by the Supreme Court in *United States* v. *Cumberland Pub. Serv. Co.*, 338 U.S. 451, at page 455: "Consequently, a corporation may liquidate or dissolve without subjecting itself to the corporate gains tax, even though a primary motive is to avoid the burden of corporate taxation." Also cf. *United States* v. *Isham*, 84 U.S. 496.

Here, taxpayers could have entered a transaction entitling them to full cash payment in 1951, and in such instance would have been then taxable upon the entire amount of the bonus or advance royalty. But no such transaction materialized. The majority is in the position of ignoring that fact and taxing them as though it had.

FISHER, *J.*, agrees with this dissent.