C. W. Titus, Incorporated, Petitioner, v. Commissioner of Internal Revenue, Respondent.

Docket No. 42268.   Promulgated August 20, 1935.

*W. Leo Austin, Esq.*, and *L. E. Cahill, Esq.*, for the petitioner.
*R. P. Hertzog, Esq.*, for the respondent.

OPINION.

Trammell: This proceeding is for the redetermination of a deficiency in income tax of $73,834.79 for 1926.   Errors assigned by the petition as amended are, that the respondent erred (1) in computing the amount of allowable depletion and (2) in computing the amount of profit for 1926 arising from the sale of oil and gas leases.   The proceeding was submitted upon oral and documentary evidence and a stipulation of facts.

The petitioner is an Oklahoma corporation, organized January 1, 1926, with its principal place of business at Tulsa.   During 1926 it was engaged in the production and sale of oil and gas and in the investment business.

Upon organization the petitioner acquired the oil and gas leaseholds theretofore belonging to C. W. Titus on property situated in Oklahoma and Kansas, giving in exchange therefor its entire issue of authorized capital stock.   The organization of the petitioner and its acquisition of the leaseholds from Titus was considered by the

petitioner and the respondent to constitute a nontaxable exchange within the meaning of section 203 of the Revenue Act of 1926.

The leaseholds thus acquired by the petitioner had been developed by Titus. This development had been done by him under oral contracts with drilling contractors. Under these contracts the contractors drilled the wells to specified producing sands at an agreed amount per foot, with the understanding that they would drill as far into the sands as Titus desired at the same rate per foot. Titus furnished all fuel for drilling the wells and also all the casing for them. Where water was not easily available to the contractor, Titus furnished it. The contractors furnished all else that was necessary for drilling the wells, including labor and drilling tools and machinery. In drilling the wells the contracts assumed all responsibility until the wells were completed to the desired depth with the hole in good shape and straight. In event the contractor lost the hole or drilled a crooked one the loss was his. Titus had no responsibility with respect to the wells until they were completed and were accepted by him. The cleaning out of the wells after reaching the desired depth was done by the contractors on a day labor basis. The contractors were not paid for the drilling until the wells were completed and in some instances not until several weeks afterwards. In some instances Titus advanced money to the contractors as loans to pay their employees. If a desired sand did not produce oil in the locality in which a well was drilled, Titus paid for the dry hole at the price originally agreed upon per foot. Drilling was done in proven and "wildcat" territory. Due to the fact that the depth at which a particular sand lay was generally known, the approximate depth to which any given well would have to be drilled was usually known at the time drilling was begun.

During the period of his ownership and prior to the transfer of the leaseholds to the petitioner Titus expended the amount of $160,-022.89 for drilling producing wells and the amount of $28,578.40 for drilling dry holes on the properties. These amounts were paid by Titus to the drilling contractors solely for drilling oil and gas wells, and no portion of the amounts was for well casing or equipment of any character. Titus charged the above amounts to expense on his books and records. He claimed them as deductions from gross income in his returns and in the determination of his individual income tax liability they were allowed as such by the respondent. Subsequent to its organization the petitioner followed the same practice of charging drilling costs to expense and deducting them on its income tax returns.

On February 27, 1926, the petitioner entered into a written agreement with the Tidal Oil Co. whereby it sold its oil and gas leases

to that company for $2,000,000, payable as follows: $500,000 in cash upon approval of titles and delivery of assignments, conveyances, orders, etc.; $500,000 on or before September 1, 1926; $500,000 on or before March 1, 1927; and $500,000 on or before September 1, 1927; all of the deferred payments to draw interest at the rate of 6 percent per annum from March 1, 1926, until paid. All payments were made to the petitioner promptly on the dates they became due.

The petitioner did not receive any notes from the Tidal Oil Co. and, aside from the written agreement wherein it agreed to make the payments in the amounts and on the dates therein specified, the petitioner did not receive any other evidence of indebtedness from the Tidal Oil Co. with respect to the unpaid portion of the sale price, nor did it retain any lien on the property transferred. The petitioner could have received the Tidal Oil Co.'s notes for such portion of the sale price if demand had been made therefor. The Tidal Oil Co. had a good reputation and the petitioner's president, Titus, had implicit faith in the company.

The petitioner kept its books and filed its income tax return on the accrual basis.

In determining the profit realized by the petitioner from the sale of the leases the respondent did not include as a part of the cost thereof to the petitioner the amounts of $160,022.89 and $28,578.40 expended by Titus for drilling during the period of his ownership. In determining the income of the petitioner for the taxable year in controversy the respondent did not compute the profit from the sale of the leases on the basis of an installment sale.

In its petition as amended the petitioner alleges that the respondent erred in computing the amount of allowable depletion. This was denied by the respondent. The pleadings show that the petitioner took a depletion deduction in its return of $585,009.91, and that the respondent disallowed $551,483.69 of the amount taken and allowed $33,526.22. The pleadings further show that the depletion allowed by the respondent was determined on the percentage basis provided for in section 204 (c) (2) of the Revenue Act of 1926. Aside from these facts and the fact that the respondent did not include in the cost to the petitioner of the leases the amounts expended by Titus for drilling on the leases during his period of ownership, we have no facts upon which to make a determination of the correctness of the respondent's action in disallowing a portion of the depletion deduction. The petitioner does not mention or discuss this allegation of error in either of its briefs and apparently has abandoned it. Anyway, the facts before us clearly are insufficient to show error on the part of the respondent and on this issue his action is sustained for lack of evidence.

The petitioner contends that in determining the profit from the sale of the leases it is entitled to include as a part of the cost thereof the amounts of $160,022.89 and $28,578.40 expended by Titus during the period of his ownership of them for the drilling of producing wells and dry holes respectively, notwithstanding the fact that Titus deducted and was allowed such amounts as expenses in his income tax returns. The respondent contends that, since the petitioner acquired the leases from Titus in exchange for all of its capital stock and Titus had deducted and had been allowed the amounts as expenses, the petitioner is not entitled to have them treated as a part of the cost in determining the profit from the sale of the leases.

Titus in 1926 transferred the leases to the petitioner for the entire issue of its authorized capital stock. He therefore was in control of the petitioner immediately after the exchange. Under these circumstances there was no recognizable gain or loss to him upon the exchange. The petitioner having acquired the leases under the foregoing circumstances, its basis for determining gain or loss on the sale of them is the same as it would be in the hands of Titus. Secs. 203 (b) (4) and (i) and 204 (a) (8), Revenue Act of 1926. This presents the question of whether if Titus had been the owner selling the leases instead of the petitioner he would have been entitled to add to his cost thereof the amounts which the petitioner seeks to have added.

*W. R. Ramsey*, 26 B. T. A. 277; affd., 66 Fed. (2d) 316; certiorari denied, 290 U. S. 673, arose under the Revenue Act of 1926, which is that involved here. There the taxpayer was engaged in the development and exploitation of oil and gas leases. The drilling on the leases was done by a contractor who was paid upon a footage basis. In all cases the taxpayer furnished, among other equipment and supplies, all derricks and boilers, fuel and water sufficient to furnish the necessary steam for drilling, a certain amount of well casing and electric current and wiring and lights and equipment for night work lighting. In addition the taxpayer employed a force of men and teams who divided their time in working in, around and upon the leases being developed and other properties which the taxpayer was operating at the time and which were producing. The wages paid these persons as well as the salaries of the taxpayer's general manager and bookkeepers he had at his main office were charged upon the taxpayer's books in part against wells being drilled and in part against operation of his producing properties. The part thus charged against wells being drilled as well as the amounts paid the contractor for drilling on a footage basis were deducted

by the taxpayer as current business expenses in his income tax returns for the years in which expended, namely 1922 through 1925. The amounts thus deducted were allowed by the respondent in determining the taxpayer's tax liability for the respective years. In 1926 the taxpayer sold the leases and in computing the gain thereon sought to have included as a part of the cost to him of the leases the amounts that he had deducted and had been allowed in his returns for the prior years. We there held that the taxpayer, having exercised the option granted to him under the regulations to charge these development costs to expense, could not capitalize them and treat them as a part of the cost of the leases in determining the gain from the sale thereof. See to like effect *C. E. Wentz, Trustee*, 26 B. T. A. 868; *C. B. Shaffer*, 29 B. T. A. 1315, and *Fort Ring Oil & Gas Co.*, 30 B. T. A. 307.

In *Mrs. R. L. Wheelock*, 28 B. T. A. 611, the taxpayer and a corporation were joint owners of an interest in an oil and gas lease, each owning one half of such interest. It was agreed that the corporation would have full charge of the operations respecting the lease, that it would receive all income therefrom, that it would pay all bills with respect thereto, that it would charge the taxpayer with one half of such bills and that it would credit taxpayer with one half of the income and remit the difference. During the taxable year the corporation developed the property and charged the taxpayer, among other things, with one half of the development costs. During the year it also remitted to the taxpayer a substantial amount after taking out of taxpayer's share of the income his share of all cost. In an income tax return for the taxable year the taxpayer deducted as an expense his share of the development costs and this was allowed by the respondent. The respondent contended that he had erroneously allowed the deduction and that the taxpayer should be required to capitalize the amount of it. We there held that the taxpayer had a right to do what was done and that the respondent could not require that the amount be capitalized.

The petitioner contends that the rule laid down in the above mentioned cases is not to be applied here, since the wells for which the amounts in controversy were expended were drilled under the contracts for completed wells, and urges that our decision in *Old Farmers Oil Co.*, 12 B. T. A. 203, is applicable. In that case certain oil wells were drilled for the taxpayer by contractors under " turn-key " contracts; that is, the " contractors furnished all casing, fuel, and materials and turned over the completed wells to petitioner for a stipulated price." The amount paid by the taxpayer for such wells was deducted by it as an expense in its income tax return for the year in which paid. In a subsequent year the taxpayer sold the leases. The respondent contended that in determining the profit

from the sale the cost of drilling the wells should not be treated as a part of the cost of the leases, since the taxpayer had deducted the amount as an expense in its return for the prior year and thus exercised the option granted under the regulations. In holding that the cost of the wells represented a capital asset and constituted a part of the cost of the leases sold, we said:

Whether the provision of the regulation which permits a taxpayer to elect whether he will deduct or charge to capital account, "Such incidental expenses as are paid for wages, fuel, repairs, hauling, etc., in connection with * * * drilling wells * * *" is a proper exercise by the Commissioner of his authority to make regulations is not before us. Petitioner made no such expenditures. What he did was to contract with third persons for completed wells and pay such persons the stipulated price therefor. By these contracts, petitioner received assets which were just as much capital assets as structures above the ground. The payment for wells when completed bears no resemblance to payments for wages, fuel, repairs, hauling, etc. Payments for such items may be in the nature of ordinary and necessary expenses, but payments for completed wells are payments for capital assets.

In *Fort Ring Oil & Gas Co.*, *supra*, the taxpayer in prior years had had wells drilled on its leases under two types of contracts. Some of the wells were drilled under contracts "requiring a completed well, with equipment furnished by the contracting driller, in place and ready for production", such drilling being designated as "turnkey drilling." The taxpayer had caused other wells to be drilled for which it paid "at so much per foot of well drilled, plus the cost of equipment", such drilling being designated as "footage drilling." In its returns for 1925 through 1928 the taxpayer deducted the cost of drilling all wells whether drilled under a "turnkey" contract or under a "footage" contract. In 1929 the taxpayer filed amended returns for 1925 through 1928 in which it treated as capital items the drilling costs which it had deducted in its original returns for the respective years. In its return for 1929 it capitalized all drilling costs incurred in that year. During its taxable year 1929 the taxpayer sold its leases. In determining the profit on the sale the respondent restored to capital the costs for "turnkey drilling" which the taxpayer had deducted but refused to restore to capital the costs for "footage drilling." The taxpayer contended that no reasonable distinction existed between expenditures for "turnkey drilling" and those for "footage drilling" and that its expenditures for the latter were capital expenditures to be included in the basis for determining the cost deductible from the sale price in ascertaining gain or loss on the sale of the leases. After pointing out that the Board and the courts make a distinction between "turnkey drilling" costs and "footage drilling" costs and that they hold that the former are not within the incidental costs covered by the respondent's regulation allowing the taxpayer an option to capitalize or to

charge to expense certain drilling costs, we held that the respondent had properly restored to capital the "turnkey drilling" costs. We further held that "footage drilling" costs stand upon a different basis and that under the respondent's regulations a taxpayer may elect whether such cost shall be deducted as an expense or charged to capital account and that since the taxpayer had made such election by deducting such costs as expense in its returns for four successive years it would not be permitted to capitalize them and treat them as a part of the cost of the leases sold.

This brings us to the question of whether the drilling costs incurred by Titus and here in controversy come within the purview of the rule applying to "turnkey drilling" cost or come within the rule applying to "footage drilling" costs. If they come within the former they are to be treated as a part of the cost of the leases sold by the petitioner in determining the profit therefrom and if they come within the latter they are not so to be treated. Under the "turnkey" contracts involved in *Old Farmers Oil Co., supra*, the contractors furnished all casing, fuel, and materials and turned over the completed wells to the taxpayer for a stipulated price. Under the turnkey contracts in *Fort Ring Oil & Gas Co., supra*, the contractors furnished completed wells with equipment furnished by them in place and ready for production. *Hughes Oil Co. v. Bass*, 62 Fed. (2d) 176; certiorari denied, 289 U. S. 726, involved the question of whether the cost of wells drilled under "turnkey" contracts was deductible as expense within the purview of the respondent's regulation granting the taxpayer an option to treat as an expense or to capitalize intangible drilling expenses paid in connection with the exploration and development of oil and gas properties. Under the "turnkey" contracts there involved the drilling contractor was obligated "to furnish all derricks, all necessary drilling equipment, machinery, casing, cement and labor, in fact, everything necessary to complete said well in a first class, workmanlike manner, including fuel and water, the owner not being obligated to furnish anything whatever in the way of labor, fuel, drilling supplies, or anything necessary for the completion of the well." The contractor was obligated to drill the wells to a stated depth in feet and for a specified amount.

The evidence in the instant case discloses that only a very small percentage of wells are drilled under "turnkey" contracts, that there is not any uniform contract with respect to "turnkey drilling", but that ordinarily "turnkey" contracts mean those under which the drilling contractor is to drill and complete a well not to exceed a specified depth, the contractor furnishing everything, and for which he is to receive a specified amount of money.

Examining the facts in the instant case in the light of the "turn-key" contracts involved in the *Old Farmers Oil Co.*, *Fort Ring Oil & Gas Co.*, and *Hughes Oil Co.* cases and in the light of what the evidence shows are ordinarily considered to be turnkey contracts, we find that the wells in the instant case were drilled on a purely footage basis, all casing and all fuel having been furnished by Titus, and where water was not readily available it too was furnished by him. A witness for petitioner who had drilled wells for Titus for about six years stated that during this time Titus furnished all the water. From the facts before us we are unable to find that the wells here involved come within the class of those drilled under "turnkey" contracts. So far as we can determine they come within the classification of "footage drilling." If the wells had been drilled under "turnkey" contracts the cost thereof would not have constituted deductions as to which Titus could have exercised an option under the respondent's regulations and thereby obtain the benefit of them as deductions in his income tax returns. In filing his returns he apparently considered that the expenditures incurred in drilling the wells were of such a character that he had an option under the respondent's regulations to deduct them as an expense. The respondent in determining the tax liability of Titus for the years in which such deductions were taken considered them in the same light and allowed them. On the showing here made we are unable to find that the action of Titus in taking such expenditures as deductions in his returns for the years in which paid was so erroneous as to warrant a holding that he would now be entitled to have them treated as capital expenditures and thus obtain the benefit of them twice. *W. R. Ramsey*, *supra; C. E. Wentz, Trustee, supra; C. B. Shaffer, supra;* and *Fort Ring Oil & Gas Co., supra.* The contention of the petitioner that the amounts of $160,022.89 and $28,578.40 should be treated as a part of the cost of the leases in determining the profit on the sale thereof is accordingly denied.

In its petition as amended the petitioner alleged that "The respondent Commissioner of Internal Revenue erred in computing the amount of profit for the year 1926 arising from the sale of oil and gas leases." In the statement of facts in the petition relied on in support of the allegation of error the petitioner stated:

In computing the profit realized in the year 1926 on account of the sale of the producing properties the sale price thereof as determined by the respondent, should be decreased by the sum of $1,000,000.00. This sum represents the portion of the sale price of the properties which was not received by this petitioner during the year 1926, and which amount was unsecured and not represented by notes or other evidences of indebtedness of the purchaser to the petitioner. Contract of sale is attached hereto and made a part hereof, and for identification marked Exhibit "B".

Both the assignment of error and the statement of facts in support thereof were denied by the respondent in his answer.

In its brief, under the head of "Issues", the petitioner restated the errors assigned in the petition and there restated the above-quoted assignment of error as follows: "That the respondent erred in refusing to compute the amount of profit arising from the sale of oil and gas leases in 1926 on the installment basis." In his brief the respondent stated the issue as follows: "Is the petitioner entitled to return on the installment basis the profit realized from the sale in 1926 of certain oil and gas leases?"

Considering the error assigned in the petition in connection with the statement of facts relied on in support thereof, it would appear that the petitioner was seeking to have reduced by $1,000,000 the sale price as determined by the respondent. In its brief, however, it stated the issue raised by its assignment of error as being whether the respondent erred in refusing to compute on the installment basis the amount of profit arising from the sale of the leases. In his brief the respondent took the same view of the issue as the petitioner. Since there is nothing in the record to indicate that the respondent determined the selling price of the leases to be any amount other than what they were sold for, which is the amount shown in the contract of sale, and since the parties are in agreement that the issue presented is whether the respondent erred in not determining the profit from the sale on the installment basis, we will regard the issue thus agreed upon by the parties, namely the applicability of the installment provisions of the statute to the transaction, as the one presented to us for decision.

Section 212 (d) of the Revenue Act of 1926 provides for the reporting of income on that basis in the case of (1) the casual sale or other casual disposition of personal property for a price exceeding $1,000, or (2) a sale or other disposition of real property, if in either case the initial payments do not exceed one fourth of the purchase price. The term initial payments is defined as meaning the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale is made. The petitioner sold the leases for $2,000,000, of which it received $1,000,000 during the taxable year. Since the total of the cash payments received by the petitioner during the taxable year was in excess of 25 percent of the selling price, it is clear that the sale was not one coming within the installment provisions of the act.

In the arguments presented in its brief in support of its contention that the installment provisions of the statute are applicable the petitioner urges that it received no note or evidence of indebtedness of the Tidal Oil Co. for the unpaid portion of the purchase price; that it retained no lien on the property sold; that it was only a

general creditor of the purchaser; that under these circumstances it could not have sold, transferred or assigned its claim against the purchaser; that, if it could have done so, such would have been possible only at a substantial discount; and that this situation warrants a determination that the profit from the sale should be computed on the " installment or deferred income basis."

The installment sale basis is not applicable, as shown above. Nor do we think the deferred payment sale basis is applicable. The implication of the petitioner's argument is that, if it had notes or some other form of evidence of indebtedness from the purchaser, the basis contended for here might not be applicable. While the petitioner did not receive any notes, mortgages, or other evidences of indebtedness of that type, it nevertheless had the agreement of sale which contained the written promise of the purchaser to make payment on specified future dates of stated amounts of the unpaid consideration, with interest at 6 percent per annum from March 1, 1926, until paid. The petitioner's president testified that the petitioner could have received the purchaser's notes for the unpaid portion of the selling price if he had asked for them. The purchaser must have offered to give such evidences of indebtedness; otherwise, petitioner's president would not have known that petitioner could have received them.

The petitioner submitted no evidence bearing on the salability or the assignability of the promise of the purchaser to make payment as evidenced by the agreement of sale, nor was any evidence offered as to the possible salability of notes of the purchaser if they had been requested by the petitioner. The record shows that the financial reputation of the purchaser was good, that the president of the petitioner, who was probably its only stockholder, had such confidence in the integrity and ability of the purchaser with respect to payment that he never looked up its financial rating, but willingly sold the leases without even asking for a note or notes, and that the indebtedness was fully and promptly paid according to the terms of the agreement as it came due.

Under the deferred payment sale basis the obligations of the purchaser received by the vendor are to be considered the equivalent of cash to the amount of the fair market value in ascertaining the profit or loss from a sale. This basis is applicable not only to cases where evidences of indebtedness other than the sales contract are received, but also to cases where the obligation of the purchaser is represented solely by the sales contract, as was the situation in the instant case. This basis contemplates that the obligation of the purchaser, by whatever form represented, has either no fair market value or a fair market value which is less in amount than the face of the obligation. Whether the obligation has or has not a fair market

value is dependent on the facts in each particular case. The effect of the petitioner's contention is that the obligation of the purchaser to make the future payments had no fair market value. From the evidence before us we are unable to find that such was the case. The petitioner having failed to show that the obligation in controversy had no fair market value or a fair market value less in amount than the face thereof, we find no ground for holding the deferred payment sale basis applicable to the transaction.

To a taxpayer keeping his books of account and reporting his income on the accrual basis, as the petitioner did, the right to receive income, even though not until some date in the future, constitutes income. *Clarence Schock*, 1 B. T. A. 528; *Owen-Ames-Kimball Co.*, 5 B. T. A. 921; *Helvering* v. *Nibley-Mimnaugh Lumber Co.*, 70 Fed. (2d) 843. The facts here presented amply indicate that the amount of the sales price remaining unpaid in the taxable year was nevertheless properly accruable in that year as income the petitioner was entitled to receive in the future. Under its system of accounting the full amount of the sale price of the property is to be accrued in the taxable year and the profit from the sale is to be determined accordingly. So far as we can determine this is what the respondent did. His action is therefore sustained.

*Decision will be entered for the respondent.*