Jones Lumber Co., Inc. v. Commissioner. Rach, Inc. v. Commissioner.
Jones Lumber Co. v. Commissioner
Docket Nos. 4323-65, 4324-65.
United States Tax Court
T.C. Memo 1967-81; 1967 Tax Ct. Memo LEXIS 177; 26 T.C.M. (CCH) 398; T.C.M. (RIA) 67081; April 20, 1967
William W. Berry, Suite 1000, American Trust Bldg., Nashville, Tenn., for the petitioners. Vallie C. Brooks, for the respondent. SCOTT
Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in the income tax of petitioner Jones Lumber Co., Inc., in the amounts of $26,005.07, $14,719.96, and $57,135.21 for its fiscal years ended November 30, 1960, November 30, 1961, and November 30, 1962, respectively, and determined deficiencies in the income tax of petitioner Rach, Inc., in the amounts of $1,584.30 and $861.74, for its fiscal years ended June 30, 1961 and June 30, 1962, respectively. *178 By amendment and second amendment to answer in the case of petitioner Jones Lumber Co., Inc., respondent claimed increases in the deficiencies as set forth in the notice of deficiency in the amounts of $2,785.02, $8,884.28, and $10,189.70 for the fiscal years ended November 30, 1960, 1961, and 1962, respectively, and by amendment and second amendment to answer in the case of petitioner Rach, Inc., claimed increases in the deficiencies as determined in the statutory notice in the amounts of $376.26 and $558.61, for its fiscal years ended June 30, 1961 and June 30, 1962, respectively. One of the issues raised by the pleadings has been conceded by respondent, leaving for our decision the following: (1) Whether petitioners are required to include in their taxable income that portion of the amount of the sale prices of "shell houses" represented by the portion of second mortgage notes on which payment was not to commence until the first mortgage had been paid in full which petitioners showed on their books as representing principal amount of the sale prices of the houses. (2) Whether petitioners should accrue in each of the taxable years here in issue amounts representing interest *179 on the second mortgage notes. The second issue was raised by respondent by the amendments and second amendments to his answers. Findings of Fact Some of the facts have been stipulated and are found accordingly. Jones Lumber Co., Inc. (hereinafter referred to as Jones Lumber), is a Tennessee corporation organized on December 23, 1957. Its principal place of business is located at Hendersonville, Tennessee. For the short taxable year January 1, 1958, through November 30, 1958, and for each of its fiscal years ended November 30, 1959 through November 30, 1962, Jones Lumber filed a Federal income tax return on form 1120 with the district director of internal revenue at Nashville, Tennessee, and for the short taxable year January 1, 1958 through November 30, 1958, and for each of its fiscal years ended November 30, 1959 and November 30, 1960, Jones Lumber filed an amended income tax return on form 1120 with the district director of internal revenue at Nashville, Tennessee. Rach, Inc. (hereinafter referred to as Rach), was incorporated under the laws of the State of Tennessee on May 28, 1959. Its office and principal place of business is located at Hendersonville, Tennessee. Rach *180 commenced business on July 1, 1960 and filed its Federal income tax returns for its fiscal years ended June 30, 1961, and June 30, 1962, with the district director of internal revenue at Nashville, Tennessee. From the date of its incorporation through November 30, 1962, two-thirds of the outstanding stock of Jones Lumber was owned by Ralph L. Jones and one-third was owned by Charles D. Jones. Ralph L. Jones was president and Charles D. Jones, vice president of Jones Lumber. During its fiscal year ended June 30, 1961, the outstanding stock of Rach was owned by Ralph L. Jones, its president and Charles D. Jones, its vice president, and during its fiscal year ended June 30, 1962, the outstanding stock of Rach was owned by Jones Lumber. During the years involved in this case the principal business of each of petitioners was the sale and construction on lots owned by the purchaser of semi-finished houses, commonly referred to as "shell houses." The purchasers of the homes were generally persons residing in rural areas in Tennessee and adjoining States who owned an unencumbered lot or plat of ground in a rural location. Most of the customers were factory workers who received a weekly *181 wage, but a few were farmers. The manner in which Jones Lumber and Rach conducted their businesses was the same. The shell houses sold by each were of two basic models. One model consisted of two bedrooms, a living room, kitchen, hall, and a place for a bathroom. Its dimensions were 24 X 26 feet. The other model consisted of three bedrooms, a living room, kitchen, hall, and a place for a bathroom. Its dimensions were 24 X 32 feet. The lumber from which the shell house was constructed was pre-cut in a standard size by petitioners at their places of business and placed in a package together with other material used in the construction of the houses. The package would be shipped to the customer's lot where the material would be used by petitioners' workmen to construct the house in accordance with the agreement between the petitioner selling the house and the customer. The exterior of the house would be constructed of pine weatherboarding which was painted with two coats of paint. Some of the houses would be sold without the interior being finished and others would be sold with the interior wallboard installed. The house would have electricity and a flue but no heating equipment. In *182 addition to the basic house, petitioners offered a plumbing package which the customer could buy and install and some of the customers bought this as an extra, but many did not. Petitioners also offered as extras a package of kitchen cabinets and insulation. The shell house industry was started sometime in the early 1950's on the theory that such a house could be sold to a person of low income who could acquire what was sometimes referred to as a "sweat" or "work" equity in the house by doing the labor in finishing the house himself, thereby acquiring a house which otherwise he could not afford because of the cash outlay which would be required. The basic cash price of the 2-bedroom model sold by petitioners was $2,850, but a purchaser could buy extras which would increase the price of this house to $3,200 or $3,300. The basic cash price for the 3-bedroom house was $3,550 and with extras this house could cost up to $4,100. Petitioners would advertise their houses in the newspaper and would include a coupon in the advertisement. A prospective customer would fill out the coupon and mail it back to the company and a salesman would go out and call on the prospective customer in an *183 effort to sell him a house. Each of petitioners had models of the houses which it offered on a lot at Nashville, Tennessee. If the prospective customer were interested when petitioners' salesman called, the salesman would arrange for the prospective customer to view the model house in Nashville. Hendersonville is approximately 15 miles from Nashville. If, after viewing the house, an individual decided to purchase one of the models offered, he would execute an agreement with the petitioner from whom he was making the purchase and if he wished to purchase the house on credit he would submit a credit application at the time of executing the agreement. Occasionally a customer paid cash for a house, and in such case the price would be reduced by approximately 10 percent. In most cases, however, the entire price of the house was financed over a period of from 6 to 14 years. The agreement signed by the customer and accepted on behalf of the petitioner making the sale was entitled, "Agreement and General Conditions." This agreement referred to the customer as the "buyer" and to the petitioner making the sale as the "builder," and provided that upon acceptance by an officer of the builder, *184 the "builder shall furnish all labor and materials needed for the construction of a house" at the specified location according to a plan attached to the agreement and signed by the buyer. The agreement carried provisions with respect to the requirement if separate contracts for any work not included in the specifications were to be made or if changes were to be made in the specifications. The agreement specifically provided that plumbing, heating, floor sanding, kitchen cabinets or fixtures would not be included unless specifically specified. It carried the following statement with respect to credit: When credit is extended the buyer agrees to furnish a marketable title as security and to pay the time price, buyer shall have the option to retire the obligation created hereby at a short rate computation and agrees that the sum of two hundred dollars shall be charged upon the exercise of this option, these covents shall be binding upon the parties, successors, assigns, representatives and administrators, and shall be governed by the law of Tennessee, except the place of performance shall rule the capacity of the parties. During the years here involved each of petitioners had understandings *185 with certain lending institutions that those institutions would buy the first mortgage notes petitioners took when a house was financed, provided the mortgage note was for only a specified number of years. During the years here in issue petitioners dealt primarily with three finance companies in selling mortgage notes they acquired from the sale of shell houses. These companies were Pioneer Finance Company, Associates Finance Company, and Rancher's Life Insurance Company. During the year 1960, one of these finance companies would not purchase a mortgage note that extended for longer than 6 or 7 years, whereas the others would purchase a mortgage note which extended for 8 years, and by the latter part of the fiscal year of Jones Lumber ended November 30, 1961, the period over which the finance companies would accept a first mortgage note had been extended beyond 8 years. During the fiscal year of Jones Lumber ended November 30, 1962, a number of the first mortgage notes discounted by the finance companies ran for 10 or 12 years, and one extended over a period in excess of 14 years. Before accepting a contract where the purchase arrangement was on credit, petitioners would submit the *186 contract with the buyer's credit application to one of the finance companies with which they were dealing and would obtain an agreement from the company that it would buy the note and mortgage executed by the purchaser to finance the house. In each instance where a credit sale was made, the purchaser was required to have an unencumbered lot. In most instances there would be a credit investigation and it might be that a title search on the lot would be conducted to insure that the prospective purchaser had a clear title to the property. The typical lot furnished by the purchaser during the years here in issue would be approximately one-half acre to an acre of land which would have a fair market value of from $200 to $400. Petitioners, in offering the houses for sale, would generally extend to all customers an opportunity to make payments over the same period of time. If petitioners were selling first mortgage notes to a company which would extend credit for 8 years, petitioners would extend this same time period to make payments to a customer where the mortgage note was to be sold to a company that required that the note be for a time not in excess of 7 years. As a result, where *187 mortgage notes were sold to a finance company willing to take only the shorter period of time, there would be a year to 2 years of payments, in many instances, which could not be included in the first mortgage note to be sold to the finance company. Each of petitioners considered it a good business practice to keep several sources of financing, and in order to accomplish this and allow the same number of years for time payments to customers requesting the maximum time, petitioners would take from some customers two notes, one secured by a first mortgage and the other by a second mortgage, the payments on the second mortgage note not to commence until payment had been made in full on the first mortgage note. When a sale was made to a purchaser who desired credit, petitioners would add on an amount to the base cash price of the house computed at 5, 6, or sometimes a higher percentage of the cash price, multiplied by the number of years over which payments were to be made. If the percentage used were 6 percent and payments were to be made over a period of 8 years, the add-on to the base price by petitioners would be 48 percent. When both a first mortgage and a second mortgage were to *188 be taken, the amount of the first mortgage note and the amount of the second mortgage note would be computed by multiplying the monthly payment obtained by dividing the number of months over which payment was to be made into the amount arrived at by adding to the base price of the house purchased the computation of add-on and multiplying this monthly amount by the number of months covered by the first mortgage note to obtain the amount of the first mortgage note, and similarly multiplying this monthly amount of payment by the number of months covered by the second mortgage note to obtain the amount of the second mortgage note. The purchaser would execute a negotiable promissory note for the amount of the payment to be secured by a first mortgage or deed of trust [1] on the house and lot and a similar note for the amount to be secured by the second mortgage or deed of trust. Each note would show on its face an amount and would state that for value received this amount, without interest, was payable to Jones Lumber or Rach, as the case might be, in monthly installments as follows. On the first mortgage note the installments would begin immediately and on the second mortgage notes the *189 installment payments would begin on the first month after the last payment due on the first mortgage note. The amount shown as the face amount, without interest, represented the amount arrived at as heretofore set forth after the base price of the house had been increased by the "add-on" amount. Upon receipt of the notes petitioners would discount the first mortgage note with the finance company who had agreed to purchase such note and mortgage. Each of the finance companies with which petitioners dealt had a different policy with respect to the terms on which it would purchase petitioners' notes, but all of the notes sold by petitioners to the three finance companies were sold with recourse. The amount of the discount was generally 31 percent and in addition each of the companies would withhold from petitioners a certain percentage of the discounted price ranging from 3 to 10 percent as further security for the payment of the note. Sometimes a finance *190 company would also withhold from the discounted price payable to petitioners an amount for fire and extended coverage insurance on the house. All of the deeds of trust and mortgages securing both the first and second mortgage notes were in the accepted form for the locality in which the land was situated and were recorded with the register of deeds in the county where the property was located. The mortgage or deed of trust would require that insurance be maintained on the property and that the policy contain a clause making the loss payable to the mortgagee or trustee under the first deed of trust. Petitioners did not require a provision in the policy making any portion of the insurance payable to the mortgagee or trustee under the second deed of trust. Generally the cash which petitioners received from the finance company upon discount of the first mortgage note would be sufficient to result in a profit to petitioners from the sale of the house but would not be equal to the full base selling price of the house. Petitioners would set up on their records the difference in the total base price of the house and the amount they had received from the finance company on the discount *191 of the notes as representing the principal amount of the second mortgage note and would designate the remaining portion of the note as interest. Petitioners did not require credit or title insurance from the mortgagor with respect to the second mortgage notes. During the taxable year ended November 30, 1960, Jones Lumber received 152 second mortgage notes in part payment for the shell houses sold by it on credit. The total face amount of these 152 second mortgage notes was $162,877.17, of which Jones Lumber showed on its books as representing principal of the cash sales price of the houses a total amount of $50,009.76. The remaining amount of the 152 second mortgage notes was shown by Jones Lumber on its books to represent the add-on for finance charges or interest. During its fiscal year ended November 31, 1961, Jones Lumber received 50 second mortgage notes in part payment for shell houses sold during that year on credit. The total face amount of these 50 notes was $64,858.92. Jones Lumber on its books showed $30,321.78 [2] as representing principal balance of sales price of the houses and showed the remaining amount as representing finance charges or interest resulting from the *192 add-on to the base cash price for credit sale. During its fiscal year ended November 30, 1962, Jones Lumber received 125 second mortgage notes in part payment for shell houses sold during that year on credit. The total face amount of the 125 second mortgage notes was approximately $220,500. [3] Jones Lumber, on its books, showed $120,671.40 of the total face amount of the notes as representing principal balance of the cash sales price of the houses with respect to which notes were taken and showed the remaining amount as representing finance charges or interest resulting from the add-on with respect to credit sales. From the *193 total amount shown by Jones Lumber on its books as principal of cash sales price of the houses, Jones Lumber offset an amount of $11,333.55 representing collections or losses through foreclosures and made certain other minor adjustments with the result that it shows an outstanding principal amount with respect to the 125 second mortgage notes received during its fiscal year ended November 30, 1962, of $109,875.40 as of the end of that year. During its fiscal year ended June 30, 1961, Rach received 15 second mortgage notes in part payment for shell houses sold during that year on credit. The total face amount of the 15 second mortgage notes was $18,269.19. Of this amount Rach showed on its books $5,281 as representing the total principal balance of the cash sales price of the houses and showed the remaining amount as finance charges or interest resulting from the add-on in connection with credit sales. During its fiscal year ended June 30, 1962, Rach received three second mortgage *194 notes in part payment for shell houses sold on credit in that year. The total face amount of these three notes was $5,436. On its books, Rach showed $3,449.46 as representing the principal amount of cash sales price included in the second mortgage notes, and showed the remaining portion of the face amount of the notes as representing finance charges or interest resulting from the add-on to the cash base price of the houses sold on credit. Both Jones Lumber and Rach, in maintaining their books and filing their Federal income tax returns during the years here in issue, used an accrual method of accounting, except insofar as their treatment of the second mortgage notes received in part payment for houses sold on credit departed from such method. On its original income tax return for its fiscal year ended November 30, 1960, Jones Lumber made no reference to the second mortgage notes except to the extent that these notes were reflected in the balance sheet portion of the return. On the amended return filed by Jones Lumber for its fiscal year ended November 30, 1960, which reported an increase in income tax over that shown on the original return because of including in income the "Finance *195 Reserves" withheld which had not been included in the original return, no portion of the second mortgage notes received was included by Jones Lumber in its gross receipts. There was attached to the return the following statement in this regard: Second Mortgage Notes The taxpayer sells or discounts its paper with various finance companies and insurance companies. The lenders, in many cases, are unwilling to finance the entire amount of the sales price of the homes; this means that the taxpayer must take a second mortgage for the balance. The terms of the first mortgage notes held by the financing agency vary from six to ten years. The second mortgage notes held by the taxpayer provide, in every case, that no payments may be collected on such obligation until at such time as the first mortgage is paid in full. During the current taxable year second mortgages in the principal amount of $50,009.76 were received by the taxpayer. The position is taken by the taxpayer that these second mortgages notes do not constitute taxable income for the current taxable year. On its income tax return filed for its fiscal year ended November 30, 1961, Jones Lumber included in gross receipts an *196 amount of $26,705.54 on account of receipt of second mortgage notes and deducted this same amount under the notation, "Bad debts (Schedule F) (See Note on Second Mortgage Notes)." The notation attached under the heading "Second Mortgage Notes" was identical with the statement attached to Jones Lumber's income tax return for the fiscal year ended November 30, 1960, except that the principal amount of the second mortgage notes was shown as $26,705.54. The "gross receipts" shown by Jones Lumber on its Federal income tax return for its fiscal year ended November 30, 1962, included an amount of $109,875.40 representing second mortgage notes received by it during that fiscal year. On its return, it deducted this same amount under "other deductions" and in the schedule attached to its return explaining other deductions gave the following explanation: "Provision for Loss on Second Mortgage Notes (See Note on Second Mortgages)." The statement attached to this return entitled, "Second Mortgage Notes" was identical to that attached to the amended return filed by Jones Lumber for its fiscal year ended November 30, 1960, except that the principal amount of mortgage notes was stated as $109,875.40. *197 On the Federal income tax return filed by Rach for its fiscal year ended June 30, 1961, no reference is made to second mortgage notes, except to the extent that these notes were reflected in the balance sheet portion of this return. On the Federal income tax return filed for its fiscal year ended June 30, 1962, Rach included $8,153.46 of the amount of its second mortgage notes in its gross receipts and deducted this same amount under the designation "Bad debts (Schedule F)." The only other explanation given for this deduction was a schedule attached to the balance sheet portion of the return explaining "Other Liabilities" which showed "Reserve for Uncollectible Second Mortgages" as of June 30, 1962, in the amount of $8,153.46 and an item entitled, "Unearned Finance Charges on Second Mortgages" as of June 30, 1962, in the amount of $13,486.29. Neither Jones Lumber nor Rach sold or disposed of any of its second mortgage notes during the taxable years involved in this case. In December 1964 Jones Lumber sold 102 of its second mortgage notes which its books showed as having a total principal amount of $42,474.69, and Rach sold 9 of its second mortgage notes which its books showed *198 as having a total principal amount of $3,145 to Pioneer Finance Company (hereinafter referred to as Pioneer), all of which notes were with respect to individuals whose first mortgage notes had previously been purchased by Pioneer and who had established a good credit rating with Pioneer. These notes were purchased by Pioneer at a discount from the face amounts of the notes but for a total amount in excess of the total principal amount as shown on petitioners' books. The notes were purchased with recourse against petitioners. In 1965 Pioneer began to experience financial difficulties because of the quality of notes and mortgages it had purchased from companies, other than either of petitioners, producing and selling shell homes. The president of petitioners noticed that as Pioneer's financial difficulties developed, it began to neglect having adjusters follow up delinquent accounts and enforce payment of installments on notes and mortgages it had purchased from petitioners. Petitioners' president requested that Associates Finance Company purchase the first and second mortgage notes and mortgages petitioners had sold to Pioneer from that company in order to assure that proper collection *199 service would be given to the mortgages and notes. In response to this request from petitioners' president, Associates Finance Company in 1965 did purchase from Pioneer these notes and the first and second mortgages securing these notes for approximately $350,000 with full resource against petitioners. Respondent in his notice of deficiency to Jones Lumber increased the income as reported by that petitioner for its fiscal year ended November 30, 1960, by $50,009.76 with the explanation that on its amended return, Jones Lumber had understated sales in that amount since it was determined that the face value of second mortgage notes received was includable in the taxable income of Jones Lumber as part of the amount realized on the sales and construction of shell houses. Respondent increased the taxable income of Jones Lumber for its fiscal year ended November 30, 1961, by the amount of $26,705.54 with the explanation that bad debts had been overstated in this amount in that this amount represented the face value of the second mortgage notes which Jones Lumber had not established to be uncollectible. Respondent increased the income as reported by Jones Lumber for its fiscal year ended *200 November 30, 1962, by the amount of $109,875.40 with the explanation that Jones Lumber had claimed this amount as "provision for loss on second mortgage notes" and that it was determined that this was not a proper deduction and that the face value of second mortgage notes received during the year was includable in the taxable income of Jones Lumber. By amendment to answer and second amendment to answer, respondent alleged that Jones Lumber, in addition to the taxable income as determined by respondent in his notice of deficiency, had received income for its fiscal years ended November 30, 1960, November 30, 1961, and November 30, 1962, in the amounts of $5,355.79, $17,085.16, and $19,595.58 in the form of interest accrued on notes payable to it, and alleged in the alternative that if interest should be computed at 6 percent the amount of the understatement of interest income for each of the fiscal years ended November 30, 1960, November 30, 1961, and November 30, 1962, was $1,301.33, $3,823.33, and $7,781.21, respectively. Respondent in his notice of deficiency issued to Rach increased the taxable income of that petitioner for its fiscal year ended June 30, 1961, by the amount *201 of $5,281 with the explanation that sales were understated in this amount since it was determined that the face value of second mortgage notes received was includable in Rach's taxable income as part of the amount received on sales or construction of shell houses. For the fiscal year of Rach ended June 30, 1962, respondent increased Rach's taxable income as reported by the amount of $8,153.46 with the explanation that the deduction in this amount representing the face value of second mortgage notes claimed by Rach as a deduction for bad debts was not proper in that Rach had not established that these notes were uncollectible. Respondent in amendment to answer and second amendment to answer alleged that in addition to the increases in taxable income made by him in the notice of deficiency issued to Rach for its fiscal years ended June 30, 1961, and June 30, 1962, Rach realized taxable income in the amounts of $1,254.22 and $1,862.04, respectively, for such years in the form of interest accrued on notes payable to Rach and that in the alternative if interest should be computed at 6 percent Rach realized additional income in the amounts of $240.88 and $506.51 for its fiscal years ended *202 June 30, 1961 and June 30, 1962, respectively. Opinion Petitioners' first contention is that under the provisions of section 1.453-6, Income Tax Regulations, [4] their second mortgage notes are to be considered as an amount realized on the sale and construction of their shell houses only to the extent of the fair market value of such second mortgage notes. Petitioners contend that these second mortgage notes had no fair market value. *203 Petitioners recognize that this section of the Income Tax Regulations refers to "sales of real property" and that "since the houses were erected on land not owned by petitioners, the houses at the time of sale were probably personal property" but contend that the provisions of section 1.453-6(a), Income Tax Regulations, should be applicable. In support of this position, petitioners cite C. W. Titus, Inc., 33 B.T.A. 928 (1936), which involved profit from the sale of oil and gas leases. In that case we held that the section of the Income Tax Regulations comparable to the present section 1.453-6(a) was applicable to a taxpayer which kept its books generally upon the accrual basis. No mention is made in the case of C. W. Titus, Inc., supra, as to whether the property involved was real or personal property. We pointed out in C. W. Titus, supra, that the Commissioner's regulations under the Revenue Act of 1921 and all subsequent revenue acts "have provided in the case of the sale of real estate on a deferred payment plan, not on the installment basis, where the obligations received by the vendor have no fair market value, *204 that the payments in cash or other property having a fair market value shall be applied against and reduce the basis of the property sold and any excess of such basis shall be taxable to the extent of the excess * * *." In George L. Castner Co., 30 T.C. 1061 (1958), we discussed the provisions of respondent's regulations similar to section 1.453-6(a) of the present regulations and pointed out that "[there] is no regulation carrying a similar provision with respect to casual sales of personal property." In George L. Castner Co., supra, we discussed our holding in C. W. Titus, Inc., supra, stating at page 1070: Actually there was no mention of any sale of personal property in the allegation of error in the Titus case, but, as alleged, the error was that the respondent had erred in computing the amount of the profit for the contract year arising from the sale of oil and gas leases. See the original report in the same case, 32 B.T.A. 1222, 1229. The only apparent reference in the transaction to personal property of any kind was that five wells were then drilling at stated locations on one one-quarter section of the lands covered by *205 the leases sold, and that the conveyances should include the interest of the seller in all equipment on the premises for use in drilling and equipping the five wells. And according to the facts as shown at page 1223 in the original report, this equipment was limited to the casing for the said wells, the fuel for drilling them, and possibly some equipment for supplying the water required for the drilling operation. There is no indication that, for the purposes of the sale, there was any segregation of the said equipment from the leases, or that any part of the sale price was allocated or allocable thereto. In short, there is every indication that the inclusion of the personal property in the conveyances to be made was purely incidental and of no controlling importance in the sale made. In George L. Castner Co., supra, we concluded that the section of the regulations dealing with deferred payment sales of real property was not applicable to sales of personal property by a taxpayer whose books were maintained and returns filed on an accrual basis of accounting. We pointed out that "under an accrual method of accounting, a receivable is accrued when the right to receive *206 it becomes fixed. It is the right to receive and not the actual receipt that determines its inclusion in gross income." This is the long-standing rule with respect to taxpayers computing income on an accrual basis. Respondent in the instant case contends that section 1.453-6(a) of his regulations is only applicable to those situations where a taxpayer makes a sale of real property involving deferred payment in which the payments in the year of sale exceed 30 percent of the selling price, so that such taxpayer is unable to meet the criteria for the installment basis provided in section 453 that an amount not in excess of 30 percent of the sale price of the real property be received in the year of sale. We need not decide this question since petitioners do not contend that their sales were of real property, and as we held in George L. Castner Co., supra, the provisions of the Income Tax Regulations which petitioners attempted to apply are applicable only to sales of real property. [5]
*207 Likewise we do not need to decide whether petitioners would come within the provisions of section 453(a) of the Internal Revenue Code of 1954[6] which permits a person who regularly sells or otherwise disposes of personal property on the installment plan to report income on an installment basis of accounting. Petitioners do not contend that they come within the provisions of this section or have elected to report their income under this section. Petitioners do not contend that they do or should be entitled to report their income otherwise than on an accrual basis except for the provisions of section 1.453-6(a) of respondent's regulations, which we hold to be inapplicable to sales of personal property. *208 Petitioners recognize that they must include in their income in the year of sale the sale prices of the houses to the extent that they have an unconditional right to receive such sale prices but point out that it has long been held that even though an item is one which would ordinarily be accruable, such item is not required to be accrued if at the date it would otherwise be accruable, there exists a reasonable doubt as to the collectibility of the item. Where sufficient doubt as to collectibility exists when a right to receive an amount arises, there does not exist an unconditional right in the taxpayer to receive since the doubt as to collectibility is sufficient to place a condition on the right to receive. H. Liebes & Co. v. Commissioner, 90 F. 2d 932 (C.A. 9, 1936), affirming a Memorandum Opinion of this Court. In that case the Court concluded that no income accrues unless there is a reasonable expectancy that the right will be converted into money or its equivalent, citing a number of cases in support of that proposition, and then stated at p. 938: The complete definition would therefore seem to be that income accrues to a taxpayer, where there arises to him *209 a fixed or unconditional right to receive it, if there is a reasonable expectancy that the right will be converted into money or its equivalent. In New York Water Service Corporation, 12 T.C. 780, 793-794 (1949), we stated at page 793: It is well settled that, before there is an obligation on a taxpayer to accrue and report unpaid interest on an obligation, there must be a reasonable probability of payment at the time the right to receive it arises. [Cases cited.] However, as we stated in First Savings & Loan Association, 40 T.C. 474, 487 (1963), citing Spring City Foundry Co. v. Commissioner, 292 U.S. 182 (1934), "The fact that there is always the possibility that a purchaser or debtor may default in his obligation is not sufficient to defer the accruing of income that has been earned." We have also held that the fact that actual payment of an amount is deferred does not cause the amount not to be includable in income by an accrual basis taxpayer when his right to receive the amount is unconditional. Key Homes, Inc., 30 T.C. 109, affirmed per curiam 271 F. 2d 280 (C.A. 6, 1959). Petitioners in the instant *210 case do not question their legal right to receive the payment provided for in the second mortgage notes but contend that they have shown such doubt as to their collectibility that they should not be required to accrue any amount represented by those notes. Several witnesses who had been engaged for many years in the banking or financing business testified with respect to the fair market value of the second mortgage notes which petitioners received upon the sale of the shell houses. This testimony in general established that at the time petitioners took the second mortgages notes, these notes were not salable to a regular financial institution. Such institutions would be unwilling to buy notes on which the first payment was not due for 6 to 10 years, secured only by whatever equity would exist over and above a first mortgage on a house constructed on a lot worth only $200 to $400 and with a very small down-payment, if any, by the purchaser. These witnesses also testified that in their opinion other financial institutions would likewise be unwilling to purchase the notes and that they would not advise clients interested in second mortgages to purchase such notes, since second mortgages *211 which were payable concurrently with the first mortgage would be the type which a purchaser would be interested in acquiring. The lack of marketability of these notes might be sufficient to show that at the time the notes were received they had no ascertainable fair market value. This fact, if proved, would not require the conclusion that the notes were of doubtful collectibility. The cases holding that collectibility of an amount is so doubtful that it is not includable in the income of an accrual basis taxpayer when the right to receive it arises, have turned on the financial condition or insolvency of the debtor. Georgia School-Book Depository, Inc., 1 T.C. 463, 469 (1943). There is very little evidence in the record as to the probability of collection of the petitioners' second mortgage notes when they come due. One of petitioners' witnesses touched on this point stating, "[they] [the second mortgage notes] have some value or he [the president of Jones Lumber and Rach] would have thrown them away, but the odds are long on these contracts paying out with a great deal of effort and a great deal of gambling and a great deal of chance, and I say they have no marketable *212 value to another person to buy." However, there is nothing in the record to show what familiarity, if any, this witness had with the debtors' financial ability or reputation for paying their debts. The record shows that the purchasers of the houses who gave the second mortgage notes were in relatively low income brackets but there is nothing to show that they did not pay their debts or would not be able to pay the second mortgage notes when they became due. These customers filed a credit statement and in the later years, where, insofar as the record shows, there was no change in the type of customers, the finance companies extended the years over which they would take first mortgage notes to a period of 10 to 14 years. Most of the second mortgage notes taken by petitioners in the years here involved would be paid before the end of 8 to 10 years. The very fact that after payment had been made for a number of years on the first mortgage notes, petitioners were able to sell some of the second mortgage notes, is some indication that the character of the makers of the first and second mortgage notes was such that there would exist a reasonable anticipation of collection of the second *213 mortgage notes at the time they became due. There is no evidence of a specific instance where a reasonable expectation to the contrary existed when the notes were taken. We recognize that a lack of marketability has some bearing on the issue of collectibility but from the evidence as a whole conclude that the reason for lack of marketability of the second mortgage notes taken by petitioners was primarily the fact that payment was deferred. For the same reasons that payment being deferred would not cause an amount not to accrue, this fact alone does not prove the lack of collectibility. Both petitioners are still holding many of the notes. They have realized payment on or sold a fair number of notes. The evidence as a whole shows not only that petitioners have failed to establish that there was no reasonable expectation of collectibility of the notes when they were received, but affirmatively shows that there were reasonable prospects of collectibility. Petitioners argue that Denver & Rio Grande Western Railroad Co. v. United States, 318 F. 2d 922 (Ct. Cls., 1963), supports their position that lack of marketability is tantamount to no reasonable expectation of collectibility *214 for an accrual basis taxpayer. That case dealt with a note received as a dividend, and the Court of Claims in footnote 1 of its opinion, pointed out that for this reason different rules were applicable from those applying to other income of an accrual basis taxpayer. Footnote 1 (318 F. 2d at 924 and 925) states: 1. Since taxpayer received "property", i.e., the note, in 1947, it is immaterial whether it was on the accrual or the cash basis. Moreover, the Treasury Regulation, supra, [Treas. Reg. 111, § 29.115-1] expressly provide that dividends are to be taken into income "when the cash or other property is unqualifiedly made subject to * * * [the taxpayer's] demands." It has been held that dividend income must be reported, even by an accrual basis taxpayer, at the time of receipt and not when the right to receipt is determined. Tar Products Corp. v. Commissioner, 130 F. 2d 866, 143 A.L.R. 593 (C.A. 3, 1942); Commissioner v. American Light & Traction Co., 156 F. 2d 398, 167 A.L.R. 300 (C.A. 7, 1946); Beneficial Corp. v. Commissioner, 202 F. 2d 150 (C.A. 3, 1953), affirming 18 T.C. 396 (1952); Frelbro Corp. v. Commissioner, 36 T.C. 864, 871 (1961). *215 Because of the different factual situation involved, Denver & Rio Grande Western Railroad Co. v. United States, supra, does not support petitioners' position in the instant case. We sustain respondent in the determination as made in his notice of deficiency that the principal amounts of the second mortgage notes received by petitioners in the years here in issue in payment for shell houses sold by them are includable in the gross receipts and compensating amounts are not deductible as bad debt reserves. Respondent by affirmative allegation contends that in each of the years here involved some amount of interest is accruable by petitioners with respect to the second mortgage notes. The record shows that the notes were for a stated amount without interest but that interest was shown as a figure on petitioners' books. The amount shown on petitioners' books as interest was arrived at by deducting from the face amount of the notes, the amount of the cash sales price of the houses which petitioners had not received upon discount of the first mortgage note. If petitioners were being currently paid on these notes, it might well be that some portion of each payment should *216 be credited to interest and reported as income. See Gunderson Bros. Engineering Corp., 42 T.C. 419 (1964), and Luhring Motor Co., 42 T.C. 732 (1964). However, in the instant case no amount was paid in the current years on any of the notes representing either interest or principal and no amount was payable for some years. Under petitioners' contract with the purchasers, no portion of the interest or finance charge on the second mortgage notes would ever be paid if the purchaser decided to pay off the cash price in full prior to paying off the first mortgage note. The required payment of $200 would, insofar as the record here shows, go to the purchaser of the first mortgage note. In any event respondent raised this issue by amendments to answer and therefore has the burden to show to the contrary. As we pointed out in Luhring Motor Co., supra, at page 742, "[while] the amount due and payable is determinable at any given moment, interest does not in a strictly legal sense accrue until it becomes due and payable," and as we further pointed out (42 T.C. at 743): The event which renders the purchaser liable for the total finance *217 charge is not the execution of the conditional sales contract, but rather it is the passage of time without his making any early payment. In our view, this is not the case of a condition subsequent (which renders the right to the total amount of finance charges subject to defeat on the occurrence of prepayment), as respondent urges, but rather the case of a condition precedent. * * * Here, the total interest or finance charge with respect to the second mortgage notes could be defeated by prepayment which we considered in Gunderson Bros. Engineering Corp., supra, and Luhring Motor Co., supra, to cause no accrual of such amounts. We therefore agree with petitioners that no amount should be included in their incomes for any year here involved representing in effect interest or carrying charges on the second mortgage notes. Decisions will be entered under Rule 50. Footnotes
1. Mortgages were used for sales in certain localities and deeds of trust, for sales in other localities. The terms, "mortgage" and "deed of trust" will be used interchangeably herein as they were in the testimony at the trial.↩
2. In the statutory notice of deficiency, petitioner Jones Lumber's income is increased by $26,705.54, apparently because of some offset of the total principal amount of the second mortgage notes received by Jones Lumber in its fiscal year ended November 30, 1961, by either collections or losses upon foreclosures. Although the record is not clear as to the composition of the $26,705.54, respondent raises no issue in this case that the principal amount of the second mortgages to be included in Jones Lumber's income should be in excess of this $26,705.54.↩
3. The exhibit in evidence listing the face amount of notes received in Jones Lumber's fiscal year ended November 30, 1962, contains certain notations which cause the exact face amount to be unclear.↩
4. Sec. 1.453-6 Deferred-payment sale of real property not on installment method. (a) Value of obligations. (1) In transactions included in paragraph (b)(2) of § 1.453-4, that is, sales of real property involving deferred payments in which the payments received during the year of sale exceed 30 percent of the selling price, the obligations of the purchaser received by the vendor are to be considered as an amount realized to the extent of their fair market value in ascertaining the profit or loss from the transaction. Such obligations, however, are not considered in determining whether the payments during the year of sale exceed 30 percent of the selling price. (2) If the obligations received by the vendor have no fair market value, the payments in cash or other property having a fair market value shall be applied against and reduce the basis of the property sold and, if in excess of such basis, shall be taxable to the extent of the excess. Gain or loss is realized when the obligations are disposed of or satisfied, the amount thereof being the difference between the reduced basis as provided in the preceding sentence and the amount realized therefor. Only in rare and extraordinary cases does property have no fair market value.↩
5. We gave this interpretation to both the regulation and our decision in George L. Castner Co., 30 T.C. 1061 (1958), in our recent opinion in George E. Freitas and Flora C. Freitas, et al., T.C. Memo. 1966-105↩.
6. SEC. 453. INSTALLMENT METHOD. (a) Dealers in Personal Property. - Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.↩